NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CARA G., | ) | |
| | ) | Supreme Court No. S-14638 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-11-00016 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1428 – August 29, 2012 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Marjorie K. Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Carpeneti, Winfree, and Stowers, Justices, and Matthews, Senior Justice.**

---

\*       Entered under Appellate Rule 214.

\*\*       Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## I.    INTRODUCTION

The question in this case is whether the superior court erred in terminating a mother's parental rights to her two young children despite her recent sobriety and progress in alcohol treatment.   The mother challenges only the superior court's finding that returning the children to her custody would be likely to cause them serious injury. The superior court's finding in this regard was predicated on its determination that the mother was likely to continue abusing alcohol and entering into abusive relationships, particularly in light of her dependent personality traits.   Because this finding was supported by expert testimony and was not clearly erroneous, we affirm the superior court's order terminating the mother's rights to her two children.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Cara G.[1] is a 26-year-old woman with six biological children.  Cara's parental rights to two of her children are at issue in this case; they are Indian children for purposes of the Indian Child Welfare Act (ICWA).[2]   Cara has a history of abusing alcohol and remaining in abusive relationships. The Office of Children's Services (OCS) has been involved with Cara and her children since 2007.  Due to her sustained problems with alcohol and violent domestic partners, none of Cara's six children are presently in her custody.  She has voluntarily relinquished her parental rights to four of her children.

---

[1]    Pseudonyms are used to protect the privacy of the people involved in this case.

[2]    25 U.S.C. §§ 1901-1963 (2006).

**1. Cara relinquishes her parental rights to her first four children, endures an abusive relationship, and unsuccessfully attempts alcohol treatment.**

Cara began using alcohol in the eighth grade. In ninth grade, she was expelled from school for nonattendance; it is unclear whether she ever resumed her education. Cara entered into a relationship with Chad N. soon after and had three children with him. In late 2006 or early 2007, Cara left the children in Chad's custody and moved in with Joseph V.

In January 2007 Cara gave her mother power of attorney to care for her eldest child and gave her sister power of attorney to care for her younger two children. In February 2007 OCS took Cara and Chad's three children into custody. OCS intervened because it received a report of harm indicating that the youngest child had anal warts, leading the agency to suspect that she had been sexually abused. OCS's intervention was also driven by Cara's decision to leave one of the children in the custody of her mother, given her mother's own problems with substance abuse and history of contacts with OCS. OCS suspected that Chad was responsible for the sexual abuse, but this was apparently never proved. Cara initially told OCS that she did not know who had abused her child. Later, Cara expressed her belief that Chad was responsible, stating: "I didn't know . . . the only person . . . their . . . her father. Because when I wasn't there he would take all three of the kids in the room and close the door . . . close the door my mom said, and wouldn't let them go out in the living room by her." In 2009 Cara relinquished her parental rights to her three children with Chad; they were adopted by her sister.

In January 2008 Cara gave birth to a boy, Junior, who was fathered by Joseph. OCS opened a case plan for the family. In November 2008 OCS received a report of harm in Cara's household. According to a police report, Joseph menaced Cara

with a knife in her home, in the presence of all four of her children. Joseph then left the house with Junior, without taking warm clothing, diapers, or food for the infant. Around the same time, Junior tested positive for illegal drugs; it is unclear how the drugs entered his system. In December 2008 OCS took custody of Junior. In September 2010 Cara relinquished her parental rights to Junior.

After Junior was removed, Cara continued to participate in an "off and on" relationship with Joseph for more than a year. During this period, Cara repeatedly endured violence and threatening behavior at the hands of Joseph. In January 2009 Joseph broke into Cara's home, punched her in the head while she was sleeping, and urinated on her bed. On another occasion, apparently in April 2010, Joseph again broke into Cara's home, threw her furniture around the room, and punched a hole in a cabinet. Later in 2010 Cara contacted the Juneau Police Department (JPD) to report that Joseph had been involved in an altercation with her father and had sent her threatening text messages. In the text messages, which the JPD photographed, Joseph urged Cara to "kill yourself you tried before just do it this time" and repeatedly threatened to kill her himself.

At times during this period, Cara lied to OCS, claiming she was no longer in a relationship with Joseph when, in reality, she was. And in a psychological evaluation conducted in June 2009, Cara denied being a victim of domestic violence, though she admitted that Joseph had once broken into her house. By the time of the September 2011 termination trial in the instant case, Cara believed Joseph presented a risk to her children because "he's bossy and loud" and frequently "mad." Cara apparently ended her relationship with Joseph some time in 2010. But throughout the aforementioned incidents, even following the vicious and threatening text messages, Cara remained in her "off and on" relationship with Joseph.

In June 2009 Cara participated in an alcohol dependence assessment with Beverly Mueller, a chemical dependency examiner at the National Council on Alcoholism and Drug Dependence. During the interview, she acknowledged often drinking on weekdays in the past but claimed to have quit drinking in January 2009. Cara was diagnosed with alcohol dependence in partial remission. Later that summer, OCS referred Cara to the Fairbanks Native Association's (FNA) substance abuse treatment program.[3] Cara gave up her apartment in Juneau based on representations that she would be admitted to the FNA inpatient program. But Cara was denied admission to the FNA program, possibly because OCS had mistakenly recommended that she receive outpatient, rather than inpatient, treatment. In August 2009 Cara entered a different residential alcohol treatment program, but she left after only four or five days. According to Cara, this was because she felt "emotional and homesick."

### 2. Cara gives birth to Joey; Joey is removed.

In early 2009 Cara became pregnant with the child of another man, Philip P. Cara remained in her intermittent relationship with Joseph while pregnant with Philip's child. Cara claimed that she did not consume alcohol during the pregnancy. Cara gave birth to a son, Joey, in September 2009, and OCS quickly developed a safety plan. OCS was concerned for Joey's safety because Cara was still living with Joseph at the time. OCS was also concerned that Joey would not be safe around his father, due to Philip's criminal history. In 2004 Philip was convicted of assaulting his two-year-old child from an earlier relationship. According to testimony from grand jury proceedings, Philip's child suffered a subdural hematoma and extensive bruising on his face, abdomen, and head. Philip unsuccessfully appealed his conviction to the court of

---

[3] Cara had apparently unsuccessfully attempted an outpatient treatment program previously in 2008.

appeals and has never admitted to assaulting his child. Around the time OCS developed a safety plan, Philip violated his conditions of probation and a bench warrant was issued for his arrest; he was subsequently incarcerated and was accordingly unable to care or provide for Joey.

In accordance with OCS's safety plan, Cara and Joey moved to a women's crisis shelter in late 2009, where they lived for two months. OCS also developed a case plan for Cara and her children. Cara agreed to care for Joey and ensure his safety, maintain contact with Junior, and attend treatment for alcohol abuse. Cara was referred to the Dena A. Coy treatment program, where she was placed on the waiting list. Cara was apparently on the waiting list for this program for more than a year and was not admitted until December 2010. Cara's case plan required her to attend Alcoholics Anonymous meetings in the interim, but she failed to do so.

During the first half of 2010, OCS became aware of a number of incidents that made the agency doubt Cara could safely parent Joey. In March, Cara was present in a car that was stopped by the JPD for having intoxicated passengers and open containers of alcohol. Cara was apparently not intoxicated and was provided a ride home by the police. In April, as previously discussed, Joseph broke into Cara's home. Later in April, Cara was cited for driving without a valid license and without Joey secured in a car seat or by a seatbelt. Cara explained that Joey had been in the car seat, but that she removed him and put him in the front passenger seat when he started to cry. In May, Cara failed to send Joey to daycare that had been paid for by OCS. In June, as discussed, Joseph was involved in an altercation with Cara's father and later sent Cara threatening text messages. Later in June, Cara was seen in downtown Juneau drinking alcohol. On another occasion in June, Cara was involved in a disturbance of the peace at 4:00 a.m. In July, Cara was again cited for a seatbelt violation when she was pulled over while one of her older children was sitting on Cara's sister's lap.

On the basis of these incidents, on July 13, 2010, OCS removed Joey from Cara's custody. The same day, OCS held a meeting with Cara to discuss the incidents and inform her that Joey had been removed from her custody. According to a social worker, Cara openly discussed the incidents of the previous months during the meeting and admitted that she had attended Fourth of July festivities with Joseph.

Joey was initially placed with one of Cara's cousins, but she proved unable to care for the child. Joey was then placed in a non-relative foster home, where he apparently remained up until the termination trial in the instant case.

### 3. Cara undergoes substance abuse and psychological evaluations, fails to attend inpatient alcohol treatment, is victimized by Philip, gives birth to Jeremiah, and begins outpatient alcohol treatment.

In late July 2010 Cara participated in a new substance abuse assessment with Mueller. During the interview, Cara "denie[d] any pattern of use (daily, weekly etc.) but [reported experiencing] cravings and loss of control." Cara acknowledged that she was "a binge drinker using more than 6 drinks on an occasion" but reported that she had been drunk only "6-7 times in the past 7 months." Cara apparently expressed a desire to enter residential treatment at Dena A. Coy, where she was still on the waiting list, and to take Joey with her to the center. Mueller diagnosed Cara with alcohol dependence, finding that Cara "is unable to control her use of alcohol and is experiencing debilitating consequences" and that she "lost her children due to her alcoholic behavior." In keeping with her earlier assessment, Mueller again recommended that Cara enter an inpatient treatment program.

Cara apparently entered into a sustained relationship with Philip sometime after Joey was removed. On July 31 the JPD responded to a report of a domestic disturbance between Cara and Philip. According to Cara, she and Philip were drinking and began arguing. When she left Philip's trailer, he followed her and "rais[ed] his

voice." This caused the neighbors to call the police. When the police arrived, Cara and Philip stated that they were merely having a disagreement and would "keep it down."

In early August, OCS referred Cara for a psychological evaluation because it was concerned that she was not making progress on her case plan. Cara was evaluated by Dr. John Kesselring, a psychologist. The evaluation consisted of: (1) an interview; (2) a "symptom assessment" during which Cara rated the severity of her problems related to depression and anxiety; (3) an administration of the Wide Range Intelligence Test (WRIT), a "brief intelligence test" used to "obtain an estimate of [Cara's] level of intellectual functioning"; and (4) an administration of the Millon Clinical Multiaxial Inventory test (MCMI), which is composed of "a series of true-false questions" and yields a psychological "profile."

Based on these metrics, Dr. Kesselring concluded:

[On the WRIT, Cara] obtained a visual score in the borderline range and a verbal score that is far below average. Her functional verbal abilities, particularly involving receptive language, may be somewhat higher than the test scores indicate . . . . Nonetheless, the WRIT scores point to potentially severe deficits in basic verbal abilities . . . . The results suggest she may have deficits to a degree that would be expected to interfere with her ability to understand and learn new information, to assess situations and make appropriate decisions, to problem solve and to function independently in a range of situations.

Dr. Kesselring then suggested that Cara's low level of intellectual functioning, as indicated by the WRIT, was responsible for her continued inability to provide for the safety of her children:

[A report included in Cara's case file] includes the comments, "It is notable that [Cara] has repeatedly agreed to avoid situations that OCS has determined are unsafe and then fails to do so. When questioned, [Cara] cannot articulate what the

risks are assessed to be and it is evident that she has not internalized the ability to evaluate risk with people or situations." The implication of the verbal WRIT score is that problems of this sort are to a large extent a result of intellectual deficits. Her passive and agreeable manner is likely to be another manifestation of these deficits in large part, rather than a personality trait associated with other psychological factors.

. . . .

[Cara] is very dependent and has very low self-esteem and self-confidence. Her coping skills are limited and she is strongly influenced by the circumstances that surround her. She has not shown an effective ability to plan and organize her life to avoid bad situations for herself, or for her children.

Dr. Kesselring concluded his report by recommending that Cara undergo additional testing to "rule out specific learning disabilities or problems involving cognitive processing."

Later in August 2010 Philip was arrested for assaulting Cara. According to Cara, Philip arrived intoxicated at her mother's house, where she was staying. Cara received a telephone call, which apparently angered Philip, who grabbed Cara's phone and refused to return it. Cara responded by walking away, but Philip followed her and, in Cara's words, "threw me against — well, shoved me against the door by my neck." Cara called the police and reported that Philip had "grabbed her by her throat, causing pain." Joey was apparently present at the house when the incident occurred, but in a different room. In October, Philip pleaded guilty to domestic violence assault and was sentenced to 60 days in jail and two years of probation.

In December 2010 Cara was finally admitted to the Dena A. Coy residential alcohol treatment program. Cara "settled in" and saw a counselor, but she left after only two or three days. Cara attributed her inability to participate in the program, which was

located in Anchorage, to her desire to be with her son Joey. In February 2011 Cara participated in another alcohol abuse assessment with Mueller. Mueller reported that Cara admitted to drinking in the summer of 2010 and found that Cara "has not made any significant progress for addressing and solving her issues with alcohol use." Noting Cara's inability to "remain in residential care because the placements have been out of her home area," Mueller recommended that Cara enter an intensive outpatient treatment program at Rainforest Recovery Center.

In March 2011 Cara participated in a follow-up to Dr. Kesselring's initial psychological evaluation. This assessment mainly consisted of an administration of the Wechsler Adult Intelligence Scale (WAIS), a psychological test meant to measure abilities such as "verbal reasoning," "knowledge acquired from one's environment," "spatial processing," and memory retention. Cara achieved a "Full Scale IQ score of 69," which put her in the second percentile of all test takers. Dr. Kesselring explained the implications of her score in his report:

> [Cara's scores] point to major deficits in her intellectual functioning, especially in her language abilities and working memory. Her Full Scale score falls in the high end of the range associated with the diagnosis of mild mental retardation, although when her adaptive abilities are also considered she appears to function at the *low end* of the borderline range of ability.
>
> . . . .
>
> She has deficits to a degree that impairs her ability to understand and learn new information, assess situations and make appropriate and consistently safe decisions, and to problem solve and function independently in a range of circumstances. . . .
>
> . . . .

I would expect [Cara] to require accommodations and assistance to successfully complete any treatment efforts for substance abuse or other problems. Her coping skills are limited and I would expect her to have continuing problems with the challenges of parenting. . . .

On June 22, 2011, Cara was admitted to the Rainforest alcohol treatment program. At the time, Cara reported that she was living at her mother's house, along with Philip, and that she had been sober since October 2010. Cara was diagnosed with alcohol dependence in early partial remission.

On June 30 Cara gave birth to Jeremiah, her second child fathered by Philip. Cara claimed that she had not consumed alcohol since learning she was pregnant with Jeremiah. A few days after Jeremiah was born, OCS developed a safety plan. Under the plan, Cara agreed to reside with Jeremiah at her sister's home and not to remove the baby from the residence, and Philip agreed to have no contact with Jeremiah unless supervised by OCS.

Cara's sister quickly grew frustrated with the arrangement and informed OCS that she would soon ask Cara to leave her home. Soon after, OCS moved for an order granting the agency temporary custody of Jeremiah; the superior court granted the motion on July 7, little more than a week after Jeremiah's birth. Jeremiah was initially placed with one of Cara's family members, and was later transferred to the same foster home as his brother, Joey. After Jeremiah was removed, OCS created a case plan calling for both Joey and Jeremiah to be adopted because "[n]either parent has made behavioral changes necessary to safely parent [Jeremiah]." On August 3, 2011, OCS filed a petition to terminate Cara's and Philip's parental rights to Joey and Jeremiah.

**B.     Proceedings**

A termination trial was held in Juneau superior court on September 19 and 20, 2011.  At the outset of trial, Philip voluntarily relinquished his parental rights to Joey and Jeremiah.  Judge Philip M. Pallenberg then heard testimony from eleven witnesses.

### 1.     Testimony establishes Cara's progress on substance abuse issues.

Bridget Easaw, a counselor at the Rainforest Recovery Center, testified that Cara had successfully completed the first step of outpatient treatment on August 26.  To accomplish this, Cara attended support groups four times a week, for six weeks; she did not miss any meetings.  During this period, Cara applied for housing and employment, and tested negative for alcohol and drugs on numerous occasions.  Easaw testified that while Cara did not recognize that she had a problem when she was initially referred to Rainforest, her attitude had changed.  According to Easaw, Cara was actively "engaged in changing her current lifestyle" and was at the time of trial "going through the 12 steps of recovery" as part of the second phase of Rainforest's program.

### 2.     Three OCS experts testify to Cara's inability to provide for the safety of her children.

Mueller was recognized by the court as an expert in chemical dependency.  She testified generally about her assessments of Cara and opined that given Cara's long history of substance abuse, Cara would need to remain sober for at least a year for Mueller to be confident that she would remain sober.  Mueller was not aware of Cara's recent sobriety and progress in treatment.

Shelly Gomez, an OCS employee who had been Cara's case supervisor since 2008, was recognized as an expert in social work by the court.  Gomez testified that she believed Joey and Jeremiah "would be at serious risk" of emotional harm if returned to Cara's custody.  Gomez explained:  "[R]esearch has shown that domestic violence

affects children's brains and it causes portions of their brain to even die . . . that could cause life-long issues with schooling and learning and . . . forming basic attachments." Gomez testified she believed the children would also be at serious risk of physical harm because "when children are around domestic violence as they get older they will intervene and . . . that could be a definite risk in both boys' case[s] that they could . . . be present and get injured during an altercation." Gomez further testified that Cara put her children at risk by continuing to associate with family members with domestic violence issues. But Gomez also stated that she was unaware of any recent incidents of domestic violence involving Cara.[4]

Dr. John Kesselring was recognized by the court as an expert in clinical psychology. Dr. Kesselring mainly summarized his previous evaluations of Cara, noting that she "[s]eemed to be making poor choices" and was "overwhelmed with certain demands of . . . day to day living." Dr. Kesselring then testified to Cara's low levels of intellectual functioning and suggested that Cara did not have "the capacity to do certain tasks; she'd look to others to take care of it for her." Dr. Kesselring testified that people with Cara's scores are capable of raising children but are more likely to need parenting support.

### 3. Cara fails to acknowledge that Philip poses a danger to children.

Cara also testified regarding her understanding of OCS's involvement with her family. Cara stated she understood that OCS initially developed a safety plan for Joey "because . . . I was involved with [Joseph] and because of [Joey's] biological father, of his violence history." Cara then stated that she agreed with OCS's assessment regarding the dangerousness of Joseph and Philip. But Cara also testified that she

---

[4] Gomez did, however, note that there were recent reports of substance abuse in Cara's mother's home, where Cara was staying at the time.

remained "good friends" with Philip and admitted to having lived with him until about a month before the trial. Cara had previously told an OCS worker that she and Philip separated because she wanted to regain custody of her children and the two agreed that this was more likely to occur if they were no longer together. Cara testified that she was aware that Philip had been convicted of "abusing a two year old" but that she "didn't want to know any more" about the incident. And when asked whether she believed Philip posed "any type of risk to any of your children," Cara answered: "To be honest, no." At the time of trial, Philip continued to deny assaulting his infant child or assaulting Cara in August 2010.

### 4. The superior court terminates Cara's parental rights to Joey and Jeremiah.

On December 21, 2011, the superior court issued an order terminating Cara's parental rights to Joey and Jeremiah. The superior court first found that OCS proved by clear and convincing evidence that the boys were children in need of aid under AS 47.10.011(6) (substantial risk of physical harm); (8)(B)(iii) (substantial risk of mental injury due to domestic violence); (9) (neglect); and (10) (substance abuse), and that Cara had not remedied her conduct within a reasonable time. Next, the court found by clear and convincing evidence that OCS made active efforts to prevent the breakup of Cara's "Indian family."[5] The court then found by a preponderance of the evidence that termination of parental rights was in the best interests of both children.[6]

---

[5] *See* 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[6] *See* AS 47.10.088(a)(3); CINA Rule 18(c)(3).

Finally, the superior court found, beyond a reasonable doubt, that Cara's continued custody of the boys was likely to cause them serious emotional or physical injury.[7] The court stated:

> Perhaps [Cara] can maintain her sobriety. I hope so. But I conclude it is likely that she will continue her very longstanding pattern of drinking and associating with unsafe partners. If she did this while having custody of the children, serious emotional or physical damage is a near certainty.

In more detailed written findings of fact, the court found:

> There is evidence beyond a reasonable doubt, including the testimony of various qualified experts pursuant to the Indian Child Welfare Act, including Bev Mueller, Dr. Kesselring and Shelly Gomez that return of the children to [Cara's] custody is likely to result in serious emotional and/or physical damage to the children. Dr. Kesselring provided testimony about [Cara's] functionality; Ms. Mueller provided testimony of her unresolved substance abuse addiction. Ms. Gomez provided testimony that her partner choices place[] her children at serious risk of physical harm, if they were caught in the cross fires, as well as testimony about the devastating effects domestic violence has on a child's emotional development. She also testified to the risk of serious physical damage [Cara] places her children in when she is unable to protect them from [a] violent partner. She also testified to the risk of serious physical damage [from Cara] based on her judgment, whether it is failing to see the risk [Philip's] history has or when she drives without them in seatbelts.

> Cara appeals the order terminating her parental rights to Joey and Jeremiah.

---

7  *See* 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

## III.  STANDARD OF REVIEW

In CINA cases, we review the superior court's factual findings for clear error.[8]  "Whether substantial evidence supports the trial court's conclusion that a child is likely to be seriously harmed if returned to her parent is a mixed question of fact and law, while whether the expert testimony requirement of [the] Indian Child Welfare Act is satisfied is a pure question of law which we review de novo."[9]  When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.[10]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err In Finding Beyond A Reasonable Doubt That Returning Joey And Jeremiah To Cara's Custody Was Likely To Cause Them Serious Emotional Or Physical Damage.

Cara argues that the superior court erred in finding that OCS proved beyond a reasonable doubt, by use of expert testimony, that returning Joey and Jeremiah to her custody would be likely to cause serious emotional or physical damage to the children. The crux of Cara's argument is that the expert testimony offered by OCS was "overly general" and lacked the specificity required by this court's precedent.  In support, Cara cites to two opinions in which this court reversed the superior court's termination of parental rights because the State's expert evidence consisted of "generalizations"[11] or

---

[8]  *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011).

[9]  *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009) (emphasis omitted).

[10]  *Id.*

[11]  *C.J. v. State*, *Dep't of Health & Soc. Servs.,* 18 P.3d 1214, 1218 (Alaska 2001).

because experts did not account for a parent's recent progress in achieving sobriety.[12] Cara argues that in light of proof that she is a loving and considerate mother, OCS's evidence was insufficient to prove a likelihood of harm beyond a reasonable doubt.

OCS responds that each expert offered testimony, based on personal interactions with Cara, that Cara was not a suitable parent due to her violent relationships and alcohol abuse. OCS argues that Cara's recent sobriety does not contravene its experts' testimony, given that Easaw, the Rainforest counselor, "did not provide any testimony about Cara's likelihood of remaining sober, likelihood of avoiding relationships with dangerous men, or ability to care for her children." Finally, OCS argues that the cases Cara cites are easily distinguishable because they involved experts who "had not met the parents or the children and relied solely on the department's file."

25 U.S.C. § 1912(f) and CINA Rule 18(c)(4) require OCS to prove, "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the [Indian] child by the parent . . . is likely to result in serious emotional or physical damage to the child." We have interpreted these provisions to require "proof that (1) the parent's conduct is likely to harm the children and (2) the parent's conduct is unlikely to change. This can be proven through expert testimony alone or through aggregating expert testimony with other evidence such as testimony of lay witnesses."[13]

Here, the court found that Cara's continuing conduct was likely to harm Joey and Jeremiah based on three central factors: (1) Cara was likely to continue abusing alcohol; (2) Cara was likely to continue associating with unsafe partners; and (3) Cara's

---

[12]    *J.J. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 38 P.3d 7, 10-11 (Alaska 2001).

[13]    *Ben M.*, 204 P.3d at 1020 (internal citations omitted).

level of intellectual functioning impeded her ability to address these issues. In so finding, the superior court relied on the relevant testimony of three experts, each of whom had worked with Cara. This was not error.

The superior court's finding that Cara was likely to continue abusing alcohol was supported by evidence in the record that Cara was diagnosed with alcohol dependence and that she had attempted and failed alcohol treatment several times in the past. It certainly appears that Cara has made recent progress in her struggle with alcohol abuse but, in light of her long history of dependence, it was not clear error for the superior court to conclude that she was likely to abuse alcohol in the future.

The court's finding that Cara was likely to continue "associating with unsafe partners" was abundantly supported by Cara's testimony that Philip — who has been convicted of, but does not admit to, assaulting a two-year-old and assaulting Cara — remains her good friend and that she does not consider him a threat to her children. The finding was also supported by Gomez's expert testimony that being exposed to domestic violence would put the children at serious risk of both mental and physical injury. Finally, the superior court's finding was supported by Cara's history of remaining in a relationship with Joseph for years despite repeated incidents of domestic violence, sometimes with her children in close proximity. Given Philip's history of violence and Cara's inability to end their relationship, the superior court did not commit clear error by finding that returning Joey and Jeremiah to Cara's custody would be likely to cause serious harm to the children. Likewise, the superior court did not err as a matter of law by relying on Gomez's expert testimony "aggregat[ed] . . . with other evidence"[14] — namely, Philip's history of violence and Cara's own testimony establishing her inability to extricate herself from violent relationships.

---

[14] *Ben M.*, 204 P.3d at 1020.

Finally, the superior court found that Cara's intellectual "functionality" contributed to the risk that her continued custody of Joey and Jeremiah would be likely to cause harm to the children. This determination was also supported by evidence in the record and expert testimony. Dr. Kesselring evaluated Cara twice and found that her level of intellectual functioning caused her to be "strongly influenced by the circumstances that surround her," "very dependent," and to lack the "ability to plan and organize her life to avoid bad situations for herself, or for her children." It was not error to rely on this evidence in the record, and Dr. Kesselring's expert trial testimony, to find that Cara's intellectual functioning was likely to contribute to her difficulty in avoiding unsafe partners, thereby putting her children at risk.

This case is distinguishable from *J.J. v. State*, where we observed that "a substantial period of sobriety before trial casts doubt on the reliability of predictions based on earlier conduct" and reversed the trial court's determination that children were likely to be harmed by their formerly alcoholic mother's continued custody.[15]   In *J.J.*, we found it particularly significant that the mother had "entered into a supportive, sober relationship" and thereby "established a safe home for her children."[16] This is demonstrably not the situation here, as Cara refuses to acknowledge the danger that Philip poses to her children. Further, unlike the expert in *J.J.*, who had never met the mother,[17] each of the multiple experts who testified at trial in this case personally interacted with and evaluated Cara. An abundance of evidence in the record, along with specific expert testimony, supported the superior court's finding that returning Joey and Jeremiah to Cara's custody was likely to cause the children mental or physical injury.

---

[15]     38 P.3d at 11.

[16]     *Id.* at 9, 11.

[17]     *Id.* at 9-10.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Cara's parental rights to Joey and Jeremiah.