NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THADDEUS S., | ) | |
| | ) | Supreme Court No. S-15930 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-13-00235/ |
| v. | ) | 00236/00237/00238/00239 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1570 – February 22, 2016 |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: John Page, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

## I.    INTRODUCTION

The Office of Children's Services (OCS) petitioned to terminate a father's

---

\*      Entered under Alaska Appellate Rule 214.

parental rights to his five Indian children.[1] At the time of the termination trial the father was incarcerated, and he had been incarcerated for the majority of the children's lives. The superior court terminated the father's parental rights, concluding that he would be incarcerated for a significant portion of the children's minority, he had failed to make arrangements for his children's care, and the children would likely suffer serious physical and emotional harm if they were returned to him. The father appeals, arguing that the superior court clearly erred when it found serious harm likely.

## II.    FACTS AND PROCEEDINGS

### A.    Background Facts

Thaddeus S. and Celeste D. have five Indian children: Veronica (12 years old), Trevor (10 years old), Amanda (8 years old), Samantha (7 years old), and Vincent (5 years old).[2] Thaddeus has been incarcerated since 2009 — primarily in a federal correctional institution in California — due to a conviction for conspiring to distribute more than 500 grams of methamphetamine. When first incarcerated, his youngest child, Vincent, was not yet born, and his oldest child, Veronica, was five years old. Thaddeus's scheduled release date is May 27, 2018.

Both Thaddeus and Celeste have a history of substance abuse. At trial Thaddeus admitted that he had abused "meth, marijuana, and alcohol" and that he had used drugs when he was with the children. Celeste also had a significant problem with methamphetamine.[3] According to Celeste's childhood friend H.T., Celeste was "under

---

[1]    *See* 25 U.S.C. § 1903(4) (2015) (defining Indian child for purposes of the Indian Child Welfare Act (ICWA)). The mother is an enrolled member of the Native Village of Mary's Igloo.

[2]    Pseudonyms have been used to protect the privacy of the parties.

[3]    Celeste did not participate in the termination trial and had not seen the
(continued...)

[Thaddeus's] thumb," and Thaddeus abused Celeste. H.T. also testified that Celeste had used marijuana and alcohol before Thaddeus's incarceration. But Thaddeus testified that Celeste was not abusing substances before he was incarcerated.

Before Thaddeus was convicted Celeste was employed, and the couple owned two vehicles and had almost paid off their mobile home. But Thaddeus did not have additional resources and did not send Celeste support or establish alternative arrangements for their children after his incarceration.

### B. OCS Involvement

In 2012, while incarcerated, Thaddeus wrote to the Child Support Services Division. He asserted that Celeste was abusing methamphetamine and had abandoned the children, and he requested that the State remove the children and place them with his mother.

In January 2013 OCS investigated Thaddeus's allegations. An OCS caseworker met with Celeste and discovered that she was unemployed and homeless, but OCS concluded that the children were not in danger because Celeste denied drug use, tested negative for drugs, and had initiated the process of placing the children with family and with H.T. As part of its investigation, OCS interviewed Thaddeus's brother and mother; both believed Thaddeus wrote his letter out of spite.

In June 2013 OCS again received reports that Celeste was harming the children. These reports indicated that Celeste left two of her children alone at a homeless shelter while visiting her boyfriend, that Celeste was separating the children, and that Celeste was using methamphetamine. Celeste admitted that she was using methamphetamine, that her use had progressed to injecting the drug, that she was unable

---

**3**   (...continued)
children for almost a year before trial.

to refuse the drug, and that drug abuse had contributed to her homelessness and her inability to provide for the children.[4]

On June 24 OCS petitioned the court to adjudicate the children as children in need of aid (CINA) due to Celeste's inability to control her drug problem, Thaddeus's incarceration, and his failure to make arrangements for the children's care. Veronica and Trevor were placed with H.T.; Amanda, Samantha, and Vincent were placed with Thaddeus's cousin. The placement with Thaddeus's cousin ultimately did not work out, and in May 2014 Amanda, Samantha, and Vincent were also placed with H.T. In November the superior court adjudicated the children as children in need of aid.

## C.    The Children's Emotional Issues

After taking custody, OCS discovered that some of the children had behavioral problems. Veronica, Trevor, and Amanda — the three oldest children — were diagnosed with post-traumatic stress disorder, and Trevor was diagnosed with oppositional defiant disorder.

Trevor was admitted to North Star Hospital[5] twice due to aggressive behavior. These behaviors included assaulting children and adults and threatening to kill others and himself. Celeste suggested to OCS that Trevor had witnessed Thaddeus hurting her and that Trevor's violent behaviors may have resulted from witnessing his father's aggression. H.T. also asserted that Trevor and Veronica remembered Thaddeus's domestic violence.

In February 2014 Trevor had a "massive blowout," and the police were called. In May Trevor began banging his head against windows. H.T. felt that she could

---

[4]    Celeste stated that she was using drugs while pregnant with another child; that child is not at issue in this appeal. Celeste's drug use continued into 2014; she acknowledged that she used between $50 and $150 worth of methamphetamine daily.

[5]    North Star Hospital is a residential psychiatric treatment center.

not adequately address Trevor's behaviors and that Trevor needed a therapeutic foster home. In July 2014 Trevor was placed in a therapeutic foster home with S.C.[6]

S.C. testified that when she began caring for Trevor his behavior was at times explosive; the behaviors included throwing chairs, kicking things, threatening to hit, running away, and screaming and crying. Trevor, who is ten years old, also often talked like a three-year-old. Since arriving at S.C.'s home Trevor has not returned to North Star, but he continues to attend therapy services including "neuro feedback" therapy for post-traumatic stress disorder. S.C. explained that Trevor was "wrapped in services" while in her home, but he nonetheless regressed in December 2014 due to missing his siblings and unidentified trauma. At the time of the termination trial H.T. was interested in adopting the four children she was fostering but not Trevor. S.C. was also not interested in adopting Trevor.

OCS also received reports that Amanda was having behavior problems at school: biting, fighting, and hitting school staff. According to H.T., Amanda has expressed that she cannot control her feelings and does not know how to deal with her anger. Amanda was receiving counseling and attending a school for emotionally disturbed children. Other reports suggested that Veronica also needed counseling, but at the time of trial she remained on a wait list for such services.

### D. Trevor's Medication

In early 2014 a doctor working with North Star recommended to OCS that Trevor take medication to address his emotional issues. Initially Thaddeus and Celeste refused to give their consent for medication. Despite ongoing conversations with OCS and medical professionals, Thaddeus refused to consent because he did not believe in

---

[6] S.C. estimated that Trevor was her 12th foster child. She explained that she had worked in the mental health field for 21 years and that she had significant training to become a therapeutic foster parent.

medication; he thought Trevor's issues could be addressed by modifying his environment, and Thaddeus had himself responded negatively to medication in the past. He also refused to renew Trevor's current medications despite knowing that stopping Trevor's medication would be detrimental. Thaddeus explained that "he wanted to just see how he does off of medication."

OCS protective service specialist Rick Mitcham testified that it is important for parents to be concerned about what enters a child's body. But according to Mitcham, being off medication resulted in Trevor's behavior worsening; he noted that Trevor had been in North Star and that he was removed from a foster placement because he attacked the foster mother. The family felt that their other children were unsafe. Thaddeus eventually consented, and Trevor began receiving medication in July 2014.

### E. Reunification Efforts

In August 2013 Thaddeus was transferred from the California prison to the Anchorage Correctional Complex.[7] That month, after learning that Thaddeus had been transferred to Anchorage, Mitcham met with Thaddeus to develop a case plan.[8] Mitcham and Thaddeus discussed timelines for the case, and they discussed Thaddeus's participation in anger management, substance abuse, and parenting classes while incarcerated. Mitcham maintained contact with Thaddeus while he was in Anchorage and met with him at the correctional complex between four and six times. Mitcham informed Thaddeus about Trevor's severe issues and aggressive behavior.

OCS scheduled weekly visitation with the children while Thaddeus was in

---

[7] Thaddeus was sent to Anchorage because he was a witness in another case. Thaddeus was in Anchorage for more than one year and was transferred back to California in January 2015.

[8] Mitcham did not attempt to contact Thaddeus in California, and he did not contact Thaddeus's case manager at the federal correctional institution.

Anchorage. The visitation continued until Thaddeus returned to California in January 2015. Despite acknowledging that going from weekly contact to no contact could be difficult for the children, Mitcham did not try to facilitate contact after Thaddeus went back to California.

H.T. testified that, when visitation began, the four children in her care were excited about seeing Trevor at the visits. But she explained that the children generally did not seem excited to see Thaddeus; they "were okay with seeing their dad . . . they weren't, like, extremely happy or extremely sad." H.T. attended the first visit; she stated that Veronica and Trevor appeared happy to see Thaddeus, and Thaddeus tried to address Trevor's behavior.

According to H.T., the children often discussed missing Trevor but never talked about their mother or father. And before Thaddeus was transferred back to California, Veronica and Amanda did not want to go to visits. H.T. testified that "the only reason towards the end that they would go is because they wanted to see [Trevor] and they got candy." At the time of trial the children had not had contact with Thaddeus in three months and had not expressed desire to contact him.

S.C., Trevor's foster mother, explained that before Trevor arrived at her home Trevor and Thaddeus spoke on the phone daily. According to S.C., after she became Trevor's foster mother, Thaddeus and Trevor were allowed to talk on the phone, but Thaddeus never called. S.C. explained that Trevor idolized Thaddeus and stated that he missed his daily phone calls with Thaddeus, but S.C. also noted that Trevor recounted Thaddeus's abuse. According to S.C., Trevor claimed to have learned his explosive behaviors — yelling, screaming, and wanting to throw things — from Thaddeus. And S.C. asserted that visiting with Thaddeus in prison made Trevor "very somber, very sad"; Trevor was happier to see his siblings than his father. After visits with Thaddeus, Trevor would often talk like a baby.

Mitcham testified that according to social worker assistant notes, the children mostly chose to attend visits with Thaddeus. The children were happy to see Thaddeus, and there was a lot of laughing, playing, and prayer. But there was also a social worker assistant's note stating that during one visit Thaddeus was telling the children about his "gang banging days in the ghetto." Thaddeus explained that he made this comment because his children would eventually hear about his past and because he wanted them to learn from his mistakes. And in November 2014 Mitcham had to admonish Thaddeus for telling Trevor that he was going to pay someone to get him out of jail and then come and get Trevor. Mitcham testified that the comments resulted in Trevor having "some meltdowns over that because he wasn't sure exactly what that meant." Thaddeus agreed that his behavior had been inappropriate.

In December 2013 Thaddeus suggested that OCS place the children with his sister and mother who lived together in Anchorage, but OCS concluded that this was not an appropriate placement because the sister had prior drug-related convictions and because there were bedbugs in the home. Thaddeus did not suggest an alternative placement at that time.

Around November 2014 Thaddeus suggested placement in California with a different sister. Thaddeus did not provide the sister's contact information, but OCS independently obtained the information around December. OCS contacted the sister in February 2015; she informed OCS that she was willing to take the children. By the time of trial in April 2015 OCS had not yet determined whether the sister was a suitable placement.

While incarcerated in California, Thaddeus earned his GED and completed a parenting program, a substance abuse prevention class, a dialectical behavior therapy class, a "mindfulness art" class, a course called "Seeking Safety, PTSD," and vocational training classes in plumbing and refrigeration. Thaddeus was also waiting to interview

for, but had not yet been accepted into, a 500-hour residential drug treatment program. If Thaddeus successfully completes the program, his sentence could be reduced by up to one year. While in Anchorage, Thaddeus participated in a computer course and in a parenting class. Thaddeus asserted that he was trying to learn skills that would allow him to find employment after release and "get situated right so I can get [my] kids back."

The re-entry affairs coordinator at the California correctional institution described Thaddeus as "very well behaved" with "no behavioral issues." She asserted that Thaddeus appeared to want to better himself for his children and that he seemed to understand the importance of becoming a law-abiding citizen. According to Thaddeus, he wanted to prove that he could be a good father.

But in September 2013, Thaddeus was disciplined for fighting, and in November 2014 he was found guilty of a "major infraction" for assaulting another prisoner. And after being sent back to California in January 2015, Thaddeus did not correspond with the children and did not send any support.

## F.    Superior Court Proceedings

In October 2014 OCS petitioned to terminate Celeste's and Thaddeus's parental rights under AS 47.10.011(1) (abandonment), (2) (incarceration), (9) (neglect), and (10) (substance abuse). The petition noted that Thaddeus was incarcerated and had not made arrangements for his children's care, was unable to provide the children a safe home, and needed to participate in drug treatment, parenting classes, and anger management classes. The petition recognized that Thaddeus had participated in anger management classes and had obtained his GED, but the petition also asserted that Thaddeus had failed to fully engage in his case plan: Thaddeus failed to participate in drug treatment and failed to participate in parenting classes.

The superior court held a two-day termination trial in April 2015. Celeste did not participate, and her lawyer took no position because she had not heard from

Celeste for some time.

Karen Morrison, the OCS supervisor of family services, testified as an expert in child welfare. Morrison had never met Celeste, Thaddeus, or their children, and she based her testimony on discussions with Mitcham, the trial testimony of other witnesses, exhibits, the CINA petition, the disposition report, the permanency report, and the termination petition.

Morrison testified that it would not be reasonable for the children to wait for Thaddeus's release because they need stability, and they need to know where they will live and who will be their parent. Morrison recognized Thaddeus's participation in some programs while incarcerated, but she noted that when he is eventually released, he will still be unable to immediately resume parenting because he would first need to demonstrate over a long time period that he is able to apply the skills he learned and be a safe parent. Morrison also stated that Thaddeus did not put his children's needs first when he chose to participate in a drug trafficking conspiracy. Morrison asserted that the children needed to be cleared for adoption to move forward and enter a permanent home.

Thaddeus also testified. He admitted to past drug abuse and his troubled past, but he asserted that he wanted another chance to become a good father. Thaddeus stated that he loved his children and would agree to a guardianship for his children while he remained incarcerated.

In closing argument OCS argued that Thaddeus's parental rights should be terminated because of his two years left to serve in prison and the children's need for permanency. The guardian ad litem also favored termination, explaining that Thaddeus's incarceration prevented the formation of parent-child bonds and that the children need a permanent placement. Thaddeus responded that he had shown he was a protective father by reporting the children's harm to the State and by making serious efforts at self-improvement while incarcerated. He asserted that he wanted the opportunity to become

an active parent, and he noted that at the time of trial OCS had not established a definite permanent placement plan.

Focusing on the children's need for stability and permanency, the superior court made the requisite findings and terminated Thaddeus's and Celeste's parental rights. The court noted Thaddeus's failure to make adequate arrangements for the children's care. The court also recognized that some of the children had suffered emotional harm due to parental drug abuse, their unmet needs for permanency, and Thaddeus's unavailability due to his incarceration. The court found beyond a reasonable doubt that returning the children to Thaddeus's custody would likely result in serious harm.

## III. STANDARD OF REVIEW

"[W]hether the expert testimony requirement of ICWA is satisfied is a pure question of law to be reviewed de novo."[9] "[W]hether 'returning the child to the parent would place the child at substantial risk of physical or mental injury' [is a] factual determination[] best made by a trial court after hearing witnesses and reviewing evidence."[10] "We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[11] "Generally, conflicting evidence is insufficient to overturn the superior

---

[9] *In re Candace A.*, 332 P.3d 578, 583 (Alaska 2014) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[10] *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citation omitted) (quoting AS 47.10.088(a)(2)(B)).

[11] *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[12]

## IV.   DISCUSSION

Thaddeus contends that the superior court clearly erred when finding beyond a reasonable doubt that returning the children to his care would likely result in serious physical or emotional harm.  In support, Thaddeus argues that:  (1) there was no evidence that the children would be harmed by delaying permanency until his release; (2) the expert testimony was based on generalizations and ignored contrary evidence; (3) there was evidence that he was a caring and concerned father who was sincerely trying to improve; and (4) there was a continuing bond between Thaddeus and the children.

> ICWA provides:
>
> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.[13]

And Alaska CINA Rule 18(c)(4) similarly provides:

> Before the court may terminate parental rights, the Department must prove:
>
> . . .
>
> (4) in the case of an Indian child, by evidence beyond a reasonable doubt, including the testimony of qualified

---

**12**      *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012) (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

**13**      25 U.S.C. § 1912(f).

expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Before finding that the parent's custody is likely to cause a child serious harm, the record must demonstrate that such harmful contact exists and that such conduct is not likely to change.[14] "[P]roof must include qualified expert testimony based upon the particular facts and issues of the case."[15] "Although the [trial] court must focus on risk of future harm rather than past injury, past failures may predict future conduct."[16] To support its finding, "the trial court may aggregate [expert testimony] with other evidence as a basis for its finding."[17]

When evaluating the sufficiency of expert testimony our "case law is clear that in-person meetings are not required and the requirement for expert testimony is that it support the ultimate conclusion."[18] The key issues "are whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it."[19]

---

[14] *Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 479 (Alaska 2013) (citation omitted).

[15] *Id*.

[16] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 767 (Alaska 2009) (citation omitted).

[17] *Id*.

[18] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

[19] *Id.*

**A.** **The Evidence Supports The Superior Court's Finding That Delaying The Children's Permanency Until Thaddeus's Release Would Likely Cause Emotional Harm.**

Thaddeus recognizes that his incarceration and Celeste's drug abuse and abandonment harmed the children in the past. But Thaddeus argues that there is no evidence that the children's physical or mental health was further deteriorating due to a lack of permanency. Thaddeus notes that only Veronica and Trevor were receiving mental health services, and he asserts that there was no evidence that Trevor's situation was deteriorating. Finally, Thaddeus argues that expert witness Karen Morrison did not establish why the children's situation necessitated terminating his parental rights, and it is unclear why the children would be better off if his parental rights were terminated.

"Proof that a parent's custody is likely to cause a child serious harm requires proof that (1) the parent's conduct is likely to harm the children and (2) the parent's conduct is unlikely to change."[20] Despite Thaddeus's contention, the record supports the superior court's conclusion that returning the children to Thaddeus's care would likely cause serious emotional harm.

The Alaska Legislature has determined that "children undergo a critical attachment process before the time they reach six years of age" and that failure to attach during this time will lead to "significant emotional damage."[21] Thus the legislature has directed that "it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed

---

[20] *Id.* (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

[21] AS 47.05.065(5)(A)-(B).

from their homes are placed in permanent homes expeditiously."[22] Thaddeus has been incarcerated since 2009, and he has missed some or all of this critical period in the lives of each of his five children. The legislature's determination supports the superior court's conclusion here that providing permanency for the children as soon as possible is of the utmost importance.

The superior court's conclusion was also supported by Morrison's testimony that the children have suffered emotional harm in the past and have high needs. Because of those high needs, the children require the emotional stability of a permanent placement. Morrison further noted that the children have been in OCS custody for almost two years, and Thaddeus is not scheduled to be released until May 2018, when the children will be 14, 12, 10, 9, and 8. Moreover, Morrison testified that it is highly unlikely that Thaddeus would be able to regain custody of the children immediately upon his release because he will have to demonstrate over a period of time that he is capable of being a parent. Thus, in order to allow the children to attain permanency, and to avoid further emotional harm, Morrison concluded that the court should terminate Thaddeus's parental rights.

This evidence — the children's emotional state, Thaddeus's 2018 release date, and his inability to care for his children immediately upon release — supports the superior court's finding that Thaddeus's continued custody likely would result in serious emotional harm.

---

[22] AS 47.05.065(5)(C).

**B.** **The Expert Testimony Was Sufficient To Support The Superior Court's Finding That Thaddeus's Continued Custody Likely Would Result In Serious Emotional Harm To The Children.**

Thaddeus argues that this case is analogous to *C.J. v. State, Department of Health & Social Services*.[23]  In *C.J.* we concluded that expert testimony was insufficient when the expert witness based her testimony on generalizations with little discussion about the facts of the case.[24]  The unrebutted evidence established that C.J. was successfully parenting another child and had taken steps to position himself to parent his children in OCS custody.[25]  But the expert did not address this evidence and testified that "intermittent contact with their father had been traumatic for the children . . . and expressed concerns that additional similar experiences in the future could lead to serious physical or emotional harm."[26]  Because the expert did not discuss the particular facts of the case and because the superior court did not consider contrary evidence, we concluded that the expert testimony was insufficient and that the superior court erred in finding C.J.'s continued custody would likely result in serious physical or emotional harm to the children.[27]

Thaddeus argues that Morrison's testimony was similarly insufficient because it was generalized and failed to address contrary evidence.  He faults Morrison for failing to address "the existing parent-child bond in this case" and failing to recognize that the children's emotional states were stabilizing in foster care.  Thaddeus asserts that

---

[23]     18 P.3d 1214 (Alaska 2001).

[24]     *Id.* at 1218.

[25]     *Id.* at 1218-19.

[26]     *Id.*

[27]     *Id.* at 1217-19.

Morrison failed to adequately address the courses he completed while incarcerated, and he also contends that Morrison incorrectly concluded the children had moved on and removed Thaddeus from their lives. Thaddeus concludes that Morrison focused only on his past actions and convictions and failed to identify anything that he would do in the future to harm his children.

Thaddeus's arguments are not persuasive. Morrison's testimony was primarily based on specific evidence and, unlike the expert in *C.J.*, Morrison did not ignore contrary unrebutted evidence.

First, despite Thaddeus's contention that the children's emotional states are stabilizing in foster care, the evidence suggests that a lack of permanency would likely cause the children additional emotional harm. The evidence established that the three oldest children, ages 12, 10, and 8, all suffer from post-traumatic stress disorder and that Trevor has very serious emotional issues. Because of their high emotional needs, Morrison testified that the children must attain permanency as soon as possible. She further testified that terminating Thaddeus's parental rights is necessary to allow the children to attain that permanency and to avoid additional emotional harm.

Second, Morrison did not minimize the courses Thaddeus completed while incarcerated; she testified that "[it's great] for parents to participate in those programs." But, she noted that "using those skills in the real world where you have to find employment, a place to live, and how to avoid those previous friends that you got in trouble with or that did those same things that you did, that's a huge challenge." Morrison therefore asserted that, although Thaddeus took positive steps while incarcerated, Thaddeus would have to prove over a period of time that he could be a parent in the real world. And because of their need for permanency, the children would likely suffer additional emotional harm if they waited to see if Thaddeus could meet that challenge. Finally, Morrison's conclusion that the children living with H.T. had removed

Thaddeus from their lives was supported by evidence in the record.

Morrison's testimony was based on more than just the fact that Thaddeus is incarcerated. She considered specific, unrebutted facts regarding the children's high emotional needs, their need for permanency, and Thaddeus's inability to provide that permanency under the circumstances. Therefore we conclude that the expert testimony was sufficient to support the superior court's finding that returning the children to Thaddeus's care would likely result in serious emotional harm.

**C.** **Evidence That A Father Is Caring Does Not Necessarily Undermine A Finding That The Children Would Likely Suffer Serious Harm.**

Thaddeus argues that when he was first incarcerated Celeste was not abusing substances, was employed, and had vehicles and a home. He asserts that immediately after discovering Celeste's situation had changed, he contacted the authorities to ensure his children's well-being. Thaddeus also points to the courses he took while incarcerated — before he developed a case plan with OCS — and his efforts to enroll in a residential drug treatment program as evidence of his ongoing efforts to foster a safe relationship with his children. Thaddeus believes that his protective nature, acknowledgment of past mistakes, concern about his children's well-being, and honest desire to improve "strongly mitigated against a finding that the children would be harmed."

But as OCS persuasively argues, "Even if all that were true, it will not negate the harm that will befall these children while they wait three or more years to see if Thaddeus really can be a father." The superior court's future harm finding was based on the children's injuries that resulted from Thaddeus's drug use, drug related arrest, and incarceration and Thaddeus's inability to meet the children's needs for stability and permanency within a reasonable timeframe. Thaddeus does not argue that the children did not suffer harm due to his drug use, conviction, and arrest. He also does not argue

that he is currently available to parent the children, and he does not argue that the children do not need permanency.

Because the superior court's finding of serious future harm is based on harm that the children already suffered, their need for ongoing stability, and Thaddeus's inability to provide that stability, we conclude that the record supports the superior court's conclusion.

**D.    The Existence Of A Bond Between Thaddeus And The Children Does Not Militate Against The Superior Court's Finding That The Children Would Likely Suffer Harm If Returned To His Care.**

Thaddeus argues that the parent-child bond undermines the superior court's finding that returning the children to his care would likely cause serious emotional or physical harm. He asserts that breaking the parent-child bond could harm the children, and he argues that OCS's "short-term focus on the next three years ignored the potential lifetime of benefits the children could gain from a continued bond with their natural father."

Assuming Thaddeus established a parent-child bond, he does not effectively rebut Morrison's testimony that the children will suffer serious emotional harm by waiting to attain permanency for an unknown period of time. And although the existence of a parent-child bond is relevant in a best interests analysis, Thaddeus does not appeal the superior court's best interests determination, and he does not explain how a bond would protect the children from the likely emotional harm caused by years of continuing instability.

Before terminating Thaddeus's parental rights to his Indian children, the superior court was required to find beyond a reasonable doubt that his continued custody

would likely result in serious physical or emotional harm.[28] It is not clear how a parent-child bond might protect Thaddeus's children from continued emotional harm. Therefore, though such a bond may exist, it does not undermine the superior court's conclusion that the children were at risk of serious future harm.

## V. CONCLUSION

We AFFIRM the superior court's decision to terminate Thaddeus's parental rights.

---

[28] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009) (citing 25 U.S.C. § 1912(f); CINA Rule 18(c)(4)).