**BEN M.,** Appellant,

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES,** Appellee.

No. S–13090.

Supreme Court of Alaska.

April 3, 2009.

As Amended on Rehearing April 21, 2009.

---

Dianne Olsen, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Ben M.[1] appeals the termination of his parental rights. Because the trial court did not abuse its discretion in denying the motion Ben made on the first day of trial to continue the trial, and because it was not error to find beyond a reasonable doubt that returning his daughter to his custody would likely cause her serious harm, or to find by clear and convincing evidence that the state made active efforts to provide services to reunify the family, we affirm the termination of Ben's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Facts

Ben's daughter, Nicole, is an Indian child as defined in 25 U.S.C. § 1903(4), part of the Indian Child Welfare Act. Nicole was removed from her parents and declared a child in need of aid shortly after her birth on July 18, 2005, when she tested positive for cocaine. Nicole's mother, Robin, had previously tested positive for cocaine use during the pregnancy. Ben was incarcerated at the time. He was released from jail later in July, and in August he began taking parenting classes and visiting Nicole. He also underwent urinalysis testing to assure Office of Children's Services (OCS) that his problems with cocaine and alcohol had been addressed, and had consistently negative results for several months in fall 2005. Nicole began a trial home stay in September, with Ben agreeing to supervise contact between Nicole and Robin.

Ben and Robin stopped following their case plan and began missing urinalysis appointments in December 2005. The efforts of their caseworker Rebecca Morino to contact them met with little success. Eventually, Morino found the couple home for an unannounced visit in January 2006. The couple complied with Morino's request to take a cab to Worksafe, the entity performing the urinalysis tests, for a test that day. Ben's result was negative, but Robin's test was reported as suspect. Her specimen was out of temperature range and the report detailed other circumstances suggesting she may have been trying to falsify her result. Morino returned to the home accompanied by police officers to request that Robin leave the home. The couple yelled and gestured at her, and Ben approached her, leading an officer to step between them. The mother's

---

1. We use pseudonyms to protect the identity of family members.

urinalysis retest eventually came back positive, and Worksafe reported a later incident with the mother's urinalysis that led OCS to conclude Ben knew she was still using: The Worksafe report stated that Ben was in the lobby for several hours while she was supposed to be undergoing testing and told the receptionist that she was not yet there, but she was actually in the lobby. OCS then learned that during the time when Ben and Robin were out of contact, Robin had been using cocaine and that Ben had been involved in Robin's suspicious urinalysis incident—suggesting he knew of her ongoing cocaine use. Further, OCS discovered that the Anchorage police had been called to the home for domestic disturbances in fall 2005, and that Ben had been incarcerated for two days during that time, apparently leaving Nicole unsupervised with her mother.

OCS removed the child from the home on January 11, 2006. During the removal, Ben was very angry and yelled at the social worker. On January 17, shortly after the child's removal, OCS called Ben about his inconsistent attendance at urinalysis screening and Ben responded, "[a]s soon as you removed [Nicole], all bets were off. I'm not doing anything." Ben did not show [up] for urinalysis tests set up biweekly from January 13, 2006 through February 17, 2006, when Morino's request for testing with Worksafe expired. He also ended contact with OCS.

In early February Ben was evicted from his home. On February 20 he was incarcerated again. He had visitation with Nicole one or two times a month during this incarceration and was released in August 2006. He had a few visits with Nicole and was again incarcerated in September 2006, briefly released, and then re-arrested on "escape status" from ankle monitoring. His whereabouts from November 2006 until March 2007 are unknown. A new caseworker, Heather Rough, located him in jail in April 2007. That period of incarceration lasted from March 2007 until August 2007.

Ben requested visitation when he was released, but Rough found him confrontational and difficult to work with. The parties reached a new visitation agreement in October 2007, but Ben did not visit Nicole from October 2007 through the trial in March 2008. Ben was incarcerated again in October 2007. The record is unclear as to the length of this incarceration. He was released from jail on March 3, 2008, but this was apparently from a later, separate incarceration. His testimony during the motion for continuance suggested that he went into OCS in January 2008 for an assessment and understood that OCS would help him get into treatment. In March 2008, several days before trial, he briefly entered a residential treatment program and then left the following day to attend the first day of the trial. He did not attend the second day of the trial.

**B. Proceedings**

Three days after Nicole's birth, OCS filed an "Emergency Petition for Adjudication of Child in Need of Aid and for Temporary Custody." The petition was granted and counsel was appointed. Ben had been released from jail by this time and he and Robin enrolled in parenting classes. The family's OCS caseworker filled out a case plan in August 2005 indicating that she had made numerous attempts to contact the mother and father and that they called her and said they were busy with his work as a window washer. The plan for Ben included urinalysis testing and contacting past treatment providers to confirm that substance abuse was no longer an issue for him.

OCS placed Nicole back in the home on a trial basis in September 2005. In October 2005 the parties entered a stipulation under which Nicole was declared a child in need of aid and OCS was granted temporary custody. OCS ultimately decided, in January 2006, to remove Nicole from her parents' home after repeated problems, and place her in foster care. In February 2006 the court entered a disposition order granting OCS custody of Nicole for two years. OCS had been unable to contact Ben since the conversation with Morino, just after Nicole was removed in January 2006, stating that "all bets are off."

In March 2006 Morino learned of Ben's incarceration on February 20 and e-mailed him in jail to set up visitation with Nicole, which occurred monthly during that incarceration. OCS researched the possibility of

telephonic substance abuse assessment so that Ben could be screened for substance abuse treatment in prison; the extent and result of this research are unclear and were not the subject of testimony. A permanency hearing was held in July 2006. Morino noted in her report for a permanency hearing that the goal remained reunification but that if Ben did not comply with his case plan when released from his current incarceration, or remained incarcerated past September 2006, it would be changed to adoption. In fact Ben was released in August but then was in and out of jail for the months of September and October 2006. Morino was not able to reestablish contact with Ben until November, when she told him and his attorney that she would not schedule visitation this time until she saw some clean urinalysis tests and some compliance with the case plan.

After November Ben fell out of contact with OCS through March 2007. Morino attempted phone calls and home visits until a new caseworker, Heather Rough, replaced her in January 2007. Rough did not initially know where Ben was until she discovered that he was incarcerated in April 2007. During that incarceration, which lasted until August 2007, Rough set up telephonic visitation while Ben was jailed in Kenai and in-person visitation once he was transferred to Anchorage. Rough testified that the only thing Ben could have done regarding his case plan during this incarceration would have been to participate in substance abuse assessment when he was about to be released. The provider she identified to conduct the assessment said that it could not screen Ben until he was about to be released, which Rough believed would be October. However, Ben was released early. Rough testified that Ben was uncooperative and confrontational at meetings, and that he became argumentative and this led to discussions being ended before any progress was made at meetings.

The visitation plan was revised in October 2007. Under the new plan, OCS agreed to arrange for an evaluation with Dr. Washington Brown "to evaluate [Ben]'s parenting ability" by providing copies of written referral materials to all parties. Ben never showed up for visitation and fell out of contact with OCS some time soon after this, and then disappeared again. The state's amended termination motion in November 2007 states that Rough learned that month that Ben returned to prison in October for domestic assault and forcing another to become a prostitute. No evidence is in the record regarding what actions were taken by either party as to the assessment with Dr. Brown other than that Ben, if he was given written referral materials, did not use them to call and set up the appointment on his own.

At a pre-trial conference on January 14, 2008, Ben's attorney notified the state that Ben would be requesting another visitation hearing; the state replied that he would have to complete two weeks of urinalysis testing before such a visit would be set up. At this hearing the state requested that the court direct Ben, who was in the courtroom, to provide updated contact information to enable them to set up an evaluation with their expert, Dr. Michael C. Rose. The state did not present evidence on whether this occurred or what efforts it made to set up a meeting with Dr. Rose. Anne Ashton, who took over as caseworker on this case in January 2008, testified that Ben was out of touch from the time she took over the case and that he called OCS in March 2007 and spoke to another caseworker but did not leave his contact information for Ashton to return his call.

Also at the January 14 pre-trial conference, Ben's counsel withdrew because of a potential conflict if one of the state's proposed witnesses testified. At first, during the pre-trial conference at which the potential conflict was initially raised, OCS offered not to call the witness to avoid a long continuance while Ben's new counsel prepared for trial. However, during the same hearing, the trial was continued for Robin's sake. The trial would concern both parents' rights, and Robin had requested a representation hearing that could have resulted in a new attorney for her. The court asked both Ben's and Robin's attorneys how long a new attorney would need to get up to speed on the case; both agreed six weeks was reasonable, so the court scheduled trial for March 26, more than eight weeks away. Ultimately,

because of the length of the continuation, OCS decided to insist on calling the witness that raised the potential conflict for Ben's original attorney, and counsel withdrew. The court appointed the Office of Public Advocacy to provide conflict counsel for Ben on January 18, 2008. Ben's new attorney entered an appearance on February 1, 2008.

One week before the scheduled trial date in March 2008, Ben asked for a representation hearing because he "did not believe that [his attorney] could be prepared to try the case and ... wanted to get [it] on the record." A confidential hearing was held before Superior Court Judge Sen K. Tan. However, Ben's attorney remained on the case, Judge Tan's decision is not an issue on appeal, and Ben does not raise a claim of inadequate assistance of counsel.

After trial concerning termination of both parents' parental rights on March 26 and 27, 2008, Superior Court Judge Peter A. Michalski found that Ben had a substance abuse problem that affected his ability to maintain visitation with Nicole and therefore his ability to parent; that Ben abandoned Nicole by not visiting her from November 2006 to April 2007 and again from October 2007 to the time of trial; that he failed to participate in his case plan; that there was clear and convincing evidence that he had not remedied the conduct that put the child at substantial risk; that there was clear and convincing evidence that active efforts had been made to provide remedial services and rehabilitative programs to prevent the breakup of the family; and that there was evidence beyond a reasonable doubt that returning the child to either parent's custody would likely result in serious physical or emotional damage to her.

Ben appeals. He argues that the trial court abused its discretion in denying his motion for a continuance on the day of trial. He also argues that the required expert support for the finding of likely emotional damage beyond a reasonable doubt was lacking because the expert, Dr. Rose, did not meet

with Ben or the child, and reported his findings at a very high level of generality. His final argument is that the trial court erred in finding by clear and convincing evidence that the state provided active remedial efforts to prevent the breakup of his family.

## III. STANDARD OF REVIEW

We review a denial of a motion to continue for abuse of discretion, determining whether a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling.[2] Whether substantial evidence supports the trial court's conclusion that a child is likely to be seriously harmed if returned to her parent is a mixed question of fact and law, while whether the expert testimony requirement of Indian Child Welfare Act is satisfied is a pure question of law which we review *de novo*.[3] Finally, the question of whether OCS used active remedial efforts to reunify the family is a mixed question of law and fact.[4] When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.[5]

## IV. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion in Denying Ben's Request for a Continuance of the Termination Trial.

Ben argues that the court abused its discretion by denying his request for continuance. He first claims that his attorney was too newly appointed. He then argues that the court abused its discretion by declining to continue the case so that he could enter substance abuse residential treatment. He also claims that OCS was responsible for most of the delays prior to his request for a continuance, and that the state did not argue that the continuance was contrary to its or the child's interest.

**2.** *State, Dep't of Transp. & Pub. Facilities v. Miller*, 145 P.3d 521, 528 (Alaska 2006).

**3.** *E.A. v. State, Dep't of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002).

**4.** *Id.*

**5.** *A.M. v. State*, 945 P.2d 296, 304 n. 10 (Alaska 1997).

The original trial date in this case was August 6, 2007. Ben obtained a continuance to attempt to mediate the case. The new trial date—October 15 and 16, 2007—was continued at the state's request because a witness was unavailable. Trial was then set for January 2008. Finally, the January 2008 trial was continued because the state failed to provide the required expert witness disclosures.

■ To show that the court abused its discretion in denying his request for a continuance, Ben must show that he was deprived of a substantial right or that he was seriously prejudiced by the denial of a continuance.[6] Ben does not present an argument that he was seriously prejudiced by his counsel's performance. His substitute counsel began work on the case sometime between January 18, 2008 and February 1, 2008. At a minimum, he had more than seven weeks to prepare for trial. Just before trial, Ben had the opportunity to present his concerns about his new attorney's preparedness at a confidential representation hearing. Judge Tan found no reason for concern about Ben's attorney's ability to represent him, and Judge Tan's decision is not an issue on appeal. On the day of trial, Ben's attorney did not himself claim to be unprepared; Ben testified only that he felt uncomfortable proceeding and wanted to appeal Judge Tan's ruling on the representation hearing.

There was no evidence that Ben's attorney had been unable to prepare in the six to eight weeks provided, and Ben presents no examples of witnesses or evidence that his attorney could have produced if given more preparation time. And we place substantial weight on Judge Michalski's efforts to obtain an estimate of necessary preparation time for new counsel at a hearing in January 2008, when it first became clear that Ben's original counsel would have to withdraw. At that hearing, the court asked Robin's counsel for an estimate of adequate time to prepare so that he could schedule a new trial date.

Robin's counsel replied that six weeks would be adequate, and Ben's original counsel agreed with that estimate. And the court provided that much time. Ben was not deprived of a substantial right with regard to the proceedings. He makes no claim that representation was inadequate or ineffective, instead arguing only that he feels that his attorney possibly could have been better prepared. The substantial right Ben claims deprivation of is his right to parent—the central issue of the trial. However, because he fails to show that his right to fairly present his case was impaired,[7] we do not find that the denial of a continuance unfairly led to the ultimate result at the trial.

■ Finally, Ben argues that the trial court abused its discretion by denying his request for a continuance to complete substance abuse treatment. As we discuss in detail in Part IV.C, Ben did not cooperate with his reunification plan from June 2005 through the trial date. Ben had ample opportunity from 2005 through 2007 to obtain an assessment and enter treatment. Further, trial in this case was originally scheduled for August 2007, and we have emphasized that CINA cases are very time-sensitive.[8] The court's decision to avoid further delay was not an abuse of discretion.

**B. It Was Not Clearly Erroneous for the Trial Court To Find Evidence Beyond a Reasonable Doubt that Nicole Was Likely To Suffer Serious Emotional or Physical Damage if Returned to Ben.**

■ The federal Indian Child Welfare Act (ICWA) requires that before terminating parental rights, a court must find by evidence beyond a reasonable doubt that returning the child to the parent is likely to result in serious physical or emotional damage to the child, and that this finding be

---

6. *Miller*, 145 P.3d at 528.

7. *See Siggelkow v. Siggelkow*, 643 P.2d 985, 988 (Alaska 1982) (primary concern in abuse of discretion inquiry for denial of motion for continuance is to avoid prejudicing substantial rights by forcing party to try case without being able to fairly present his case).

8. *S.B. v. State, Dep't of Health & Soc. Servs.*, 61 P.3d 6, 16 (Alaska 2002).

supported by expert testimony.[9] Proof that a parent's custody is likely to cause a child serious harm requires proof that (1) the parent's conduct is likely to harm the children and (2) the parent's conduct is unlikely to change.[10] This can be proven through expert testimony alone or through aggregating expert testimony with other evidence such as testimony of lay witnesses.[11] Ben argues that the trial court should not have relied on the expert testimony of Dr. Michael Rose. He claims that because Dr. Rose did not meet or evaluate him or his daughter, the testimony was insufficiently rooted in details of his specific situation.

In *C.J. v. State, Department of Health & Social Services*[12] and a companion case, *J.J. v. State, Department of Health & Social Services,*[13] we held that the evidence before the trial court did not support finding that placing the children with either of their parents would result in serious damage to them.[14] We carefully analyzed the information on which the expert based his conclusions and the contradictory information in the record, and specifically and explicitly stated that we did not hold that in-person interviews were required in every case.[15] In both cases, the expert was unaware of significant recent progress the parents had made.[16] On the other hand, in *J.A. v. State, Division of Family & Youth Services,*[17] we reached the opposite conclusion although the expert had not evaluated the parents, where the expert's answers to hypothetical questions were specific and based on the full and accurate facts of the case.[18] Finally, in *E.A. v. State, Division of Family & Youth Services,*[19] we expressly recognized that the state's expert testimony need not meet the burden of proof standing alone so long as it supports the court's conclusion.[20]

It is possible that Dr. Rose's testimony would have been stronger or more detailed had he evaluated Ben in person. We note that Dr. Rose attempted to arrange a meeting through OCS. We also note that the record indicates that Ben was not in contact with OCS during the period in early 2008 in which Dr. Rose wished to meet with him. Ultimately, however, the issue is not the efforts made to arrange for a meeting, nor is it whether the court should have disregarded the entirety of Dr. Rose's opinion. Our case law is clear that in-person meetings are not required and the requirement for expert testimony is that it support the ultimate conclusion. The issues are whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it.

In his testimony, Dr. Rose identified substance abuse, domestic violence, and psychological problems as the reasons that he believed that Ben could cause harm to Nicole. With respect to substance abuse, Dr. Rose testified to the likely problems faced by parents caring for children while under the influence of substances, such as overreaction and defective judgment. Dr. Rose was aware of numerous missed urinalysis tests from 2005 to 2007, Ben's testimony that he had relapsed in December 2007, and the detailed records of treatment from Ben's court-ordered substance abuse treatment in 2004. Dr. Rose concluded that Ben had a high probability of relapse and would need further treatment.

Based on Ben's long criminal history, including episodes of family violence and Ben's arrest for forcing Robin into prostitution, Dr. Rose concluded that Ben needed "to address

9. 25 U.S.C. § 1912(f) (2006).

10. *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000).

11. *Id.*

12. 18 P.3d 1214 (Alaska 2001).

13. 38 P.3d 7 (Alaska 2001).

14. *C.J.,* 18 P.3d at 1218; *J.J.,* 38 P.3d at 10.

15. *C.J.,* 18 P.3d at 1218.

16. *J.J.,* 38 P.3d at 10; *C.J.,* 18 P.3d at 1219.

17. 50 P.3d 395 (Alaska 2002).

18. *Id.* at 401.

19. 46 P.3d 986 (Alaska 2002).

20. *Id.* at 992.

the other psychological problems that are reflected" and that he had "personality features that are dysfunctional and certainly detrimental to a child." Dr. Rose was clear that he was in no position to diagnose Ben with any particular disorder without examining him. However, Dr. Rose testified that children exposed to domestic violence can suffer negative effects to their self-esteem and emotional stability.

This testimony was consistent with other evidence at trial. The trial court found, based on other testimony, that Ben missed urinalysis appointments because he knew they would be positive, and he knew that he would be unable to visit Nicole with positive urinalysis tests. Other testimony demonstrated that Ben was aggressive and disruptive to the point that Ben would have been expelled from residential treatment had he not voluntarily left. This aggressive behavior prevented his caseworker at OCS from making any progress with him on the few occasions she was able to locate him and get him to meet with her. All of this testimony and the treatment records in evidence supported the same conclusion as Dr. Rose's testimony. Dr. Rose's conclusions were not, unlike the expert opinions in *J.J.* and *C.J.*, contradicted by any other evidence at trial.[21]

The trial court found that Ben did not visit Nicole for two periods of time that exceeded six months, and that this failure constituted abandonment of Nicole. Ben did not notify anyone of his whereabouts to arrange visitation in jail nor did he attempt to set up visitation outside of jail. Dr. Rose testified that the long periods of loss of contact, such as those periods longer than six months leading up to the trial, could affect the attachment and bonding process. The record contains substantial evidence demonstrating that Ben failed to show progress in recovering from his substance abuse, that he recently and apparently severely abused Nicole's mother, that he failed to seek visitation, and that he was repeatedly incarcerated, leaving him unable to create a stable home environment. Based on this evidence, as well as Dr. Rose's testimony, we conclude there is substantial evidence to support the court's finding beyond a reasonable doubt that returning Nicole to Ben's custody would be likely to result in serious emotional and/or physical damage to the child.

## C. The Trial Court Did Not Err in Finding that OCS Made Active and Reasonable Efforts To Provide Remedial Services to Ben.

 Ben argues that from the 2006 removal of Nicole onward, OCS's efforts to provide him with remedial services were inadequate to meet ICWA's requirement that the state make "active efforts" to provide services that might reunify the family.[22] Reunification efforts are evaluated on a case by case basis.[23] The burden is clear and convincing evidence.[24]

 The trial court relied on this court's rule that "a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[25] Incarceration can "significantly affect[ ]" the scope of active efforts required, though it does not eliminate the requirement.[26] Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more.[27]

21. See *J.J.*, 38 P.3d at 10; *C.J.*, 18 P.3d at 1219.

22. ICWA requires that "any party seeking to effect a ... termination of parental rights to [ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2006).

23. *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001).

24. AS 47.10.088(a)(3); CINA Rule 18 (c)(2); *Marcia V. v. State of Alaska, Office of Children's Servs.*, 201 P.3d 496, 502–03 (Alaska 2009).

25. *Id.* at 991 (quoting *N.A.*, 19 P.3d at 603).

26. *A.A. v. State, Dep't of Youth & Family Servs.*, 982 P.2d 256, 261 (Alaska 1999).

27. See *E.A.*, 46 P.3d at 990 (evasive and combative behavior and refusal to engage in services can excuse later minor failures); *Thomas H. v. Dep't of Health & Soc. Servs.*, 184 P.3d 9, 17

Here the trial court found that the state's active efforts included setting up visitation, discussing case plans with the parents, providing referrals to substance abuse assessments (particularly the walk-in appointments available at the department), referring Ben to anger management and parenting classes, referring him to the housing program Safe Harbor, and attempting to locate the parents. The court also found a demonstrated lack of willingness to participate, as was the case in *E.A.*, where we found that evasive and combative behavior and refusal to engage in services excused later minor failures on OCS's part.[28] The court also found that Ben intentionally evaded the department.

OCS repeatedly attempted to maintain contact with Ben, arrange visitation, and convince him to maintain clean urinalysis and obtain substance abuse screening. Ben disappeared for months at a time, from January through early March 2006, from October 2006 until April 2007, and from October 2007 through the time of trial in March 2008. Contact was reestablished each time only because OCS located Ben in prison and contacted him. Ben argues that after he told his first caseworker Morino that "all bets were off" after the removal of Nicole, she decided not to renew the scheduled urinalysis for February 2006 or make other remedial efforts. However, she did not have working phone numbers for Ben at that time and he made no attempt to provide her with contact information. When she located him in jail in March 2006, she e-mailed him to set up visitation. She also told him that no visitation or other action would be taken until Ben had several clean urinalysis tests, and she provided intake packets for substance abuse screening and treatment, but he did not use them.

Rough, his new caseworker beginning in 2007, searched for Ben and finally located him in jail in March 2007. Again, visitation was set up for him. Rough sent him some information about whom he should contact when he was close to release from jail for a substance abuse assessment. Ben was re-

leased early from prison, but did not make much progress in his case plan. He was confrontational and uncooperative in meetings with his caseworker and missed many of the urinalysis tests she arranged. She connected him with Safe Harbor, a housing program, but he did not attempt to follow up with them to obtain permanent housing. Then she attempted to approach his outbursts in her meetings with him by arranging an assessment with a psychiatrist, but he did not call the number she gave him to arrange an appointment. Ben disappeared after their last meeting in October 2007.

After the October 2007 agreement in which Ben agreed to an assessment with Dr. Brown and OCS agreed to more visitation, Ben dropped out of sight. Rough testified that she submitted a diligent-inquiry search to the Alaska Public Safety Information Network in early November and contacted relatives to look for him, but could not locate him. Ben did not renew contact with OCS and his new caseworker could not locate him. He called the office once in March and spoke to another caseworker but did not leave contact information for his assigned caseworker to return the call.

The record demonstrated that Ben's actions frustrated the state's efforts. His no-shows at urinalysis, failure to follow up with Safe Harbor and Dr. Brown, and failure to obtain a substance abuse screening demonstrated his lack of willingness to participate in the state's efforts. Most importantly, the state's efforts were unsuccessful because of Ben's long periods of lack of contact. For too many long stretches of time, Ben was unwilling to cooperate minimally or to comply with the urinalysis and visitation that the state did set up for him. Here, therefore, the court's finding that Ben demonstrated a general lack of willingness to participate is not clear error, and there was no reason to believe that additional efforts would have made a difference.

## V. CONCLUSION

The trial court was within its discretion to deny Ben's motion to continue trial brought

(Alaska 2008) (failure to make one mental health referral insignificant due to continued frustration of efforts by father's repeated incarcerations).

**28.** 46 P.3d at 990.

on the day of trial. It was not clear error to conclude, with the support of Dr. Rose's testimony, that returning Nicole to Ben was likely to cause her serious physical or emotional harm, or to find that the state made active efforts to provide Ben services to assist in reunifying him with Nicole. We therefore AFFIRM the trial court in all respects.

MATTHEWS, Justice, not participating.