NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARGOT B., | ) | |
| | ) | Supreme Court Nos. S-16318/16331/16332 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3AN-13-00303 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1621 – March 22, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |
| RYAN W., | ) | |
| | ) | |
| Appellant, | ) | Superior Court Nos. 3AN-13-00303/ |
| | ) | 00317 CN |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third
Judicial District, Anchorage, Mark Rindner, Judge.

---

\*     Entered under Alaska Appellate Rule 214.

Appearances: Barbara J. Dunham and Jennifer Hohnstein, Assistant Public Advocates, and Richard Allen, Public Advocate, Anchorage, for Appellant Margot B. Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Ryan W. Janell M. Hafner, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices. Carney, Justice, with whom Maassen, Justice, joins, dissenting in part.

## I.    INTRODUCTION

The superior court terminated a father's parental rights to two of his children by two different women; the court also terminated the parental rights of the two mothers. The father and one mother appealed, challenging the superior court's failure to delay the termination order for six months as well as the findings that OCS made active efforts to prevent the breakup of the Indian family, that returning the children to their parents' care would likely result in serious emotional damage to the children, and that it was in the children's best interests to terminate parental rights. Because the superior court's failure to delay the proceedings was not an abuse of discretion and the findings were not clearly erroneous, we affirm the terminations.

## II.    FACTS AND PROCEEDINGS

Margot B. and Ryan W. are the parents of Marley B.; Ryan is also the father of Durham K.[1] Both children are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2] Durham was born in May 2009 and lived with Margot and Ryan

---

[1]    Pseudonyms have been used to protect the family's privacy. Durham's mother does not appeal the termination of her parental rights.

[2]    *See* 25 U.S.C. § 1903(4) (2012).

when Marley was born in July 2013. The hospital staff contacted OCS shortly after Marley's birth due to concerns about domestic violence and Margot's ability to safely parent Marley. OCS assumed emergency custody of Marley at the hospital and later assumed custody of Durham. The children were placed with their paternal grandparents.[3]

Both Margot and Ryan suffer from mental health issues; Ryan also struggles with substance abuse, and the family's OCS caseworker, Alicia Scoblic, reported "a cycle . . . of either [domestic violence] or drug and alcohol use by both parents" throughout the life of the case. Margot has been diagnosed with schizophrenia; she also has anger issues. Ryan has admitted that he "probably needs medicine" for anxiety and depression. During three domestic violence incidents in December 2013, September 2014, and August 2015, police arrested one of the parents for assaulting the other; these incidents were apparently fueled by alcohol use.

Scoblic developed several case plans. Margot was required to complete parenting and healthy relationship classes and continue with her mental health services and medication management program; she completed the parenting classes but not the relationship classes. Ryan was required to complete parenting classes and a substance abuse assessment; he did not attend parenting classes and struggled with treatment. Scoblic also facilitated visitation for both parents, but they could not progress to overnight visits or placement due to the recurring incidents of domestic violence and substance use.

Scoblic emphasized to Margot the importance of "not just completing the [case plan] activities but showing it in your behavior," but Margot had difficulty

---

[3]  In March 2015 OCS removed both children from the grandparents' home and placed them in non-relative foster care after police discovered the grandparents intoxicated and unable to provide safe care for the children.

demonstrating lasting behavioral changes. Margot was arrested for assaulting Ryan in December 2013. In June 2014 she underwent a psychological evaluation with Dr. Alfred Collins; he noted that Margot's previous treatment plans "[did] not show significant progress" but concluded that Margot was now managing her condition and could begin to have more contact with Marley, "assuming . . . no mental health relapse, no substance abuse, [and] no domestic violence." He also recommended that Margot continue with individual therapy and medication and that Margot and Ryan seek couple's counseling. He stated that medication was "[m]ost essential" and that Margot had always been medication-compliant and appeared to recognize and appreciate that medication helped her. But Margot was inconsistent about attending therapy, and in September 2014 Margot was again arrested for assaulting Ryan. Shortly thereafter Margot enrolled in Mental Health Court; Scoblic helped develop the stipulations, and Margot was required to see a therapist regularly and engage in couple's counseling with Ryan. Although Margot successfully completed Mental Health Court in July 2015 and saw her clinician regularly during that period, the visits to her therapist became sporadic again afterward.

Ryan made less progress. He completed a substance abuse assessment and was referred to outpatient treatment for alcohol and cannabis dependence. He entered an outpatient program in December 2013 but made little progress and was soon referred to a residential program. He entered a residential program in October 2014 and completed it that December. Scoblic then requested that he demonstrate a period of sobriety and worked with him to seek counseling for his anxiety and depression, which seemed to be related to his substance use. But Ryan relapsed in April 2015, and he was arrested in August 2015 after he became intoxicated, threw a TV remote, and pushed Margot. Ryan pleaded no contest to misdemeanor assault and was again required to complete an outpatient substance abuse treatment program, but he was discharged as non-compliant in March 2016.

Margot and Ryan saw therapist Corby Peterson for couple's counseling from March 2015 through October 2015, when they stopped living together. They attended one more session in March 2016, but they told Petersen that they "did not have anything to talk about" and were only there "to look good for the courts." Ryan also stated during this session that he had not yet gotten counseling or medication for his anxiety and depression. Despite living apart, Margot and Ryan told Petersen that they were still seeing each other several times a week.

The termination trial took place the following month. Ryan did not attend the first day of trial and arrived late for the second day; Margot speculated that he was absent due to his anxiety. On cross-examination Margot could not explain why domestic violence was harmful to the children: "Because it just isn't, . . . I don't know how to explain it. It's just — it's just not good for the kids, I guess."

Scoblic testified that in order for OCS to feel confident in returning the children to Ryan, "[h]e would need to complete an assessment for treatment, complete treatment, be in counseling, be able to demonstrate that he has his anxiety and depression under control so that he can meet his own needs and the needs of his children," and engage in a healthy relationships or parenting class. With Margot, Scoblic was primarily concerned about domestic violence and her mental health.

Four expert witnesses also testified. Scoblic testified as an expert regarding early childhood development as it relates to children's needs, stating that Durham had received mental health services and needed a parent who could provide safety, stability, and a routine and model healthy emotional regulation. Dr. Collins testified as an expert in clinical psychology and explained how Margot would regress without individual therapy in addition to medication; he also testified about the effects of domestic violence on children. Margot's counselor, Bryan Shores, testified as an expert in substance abuse and mental health and said that Margot demonstrated only a "fleeting" understanding of

how domestic violence affects children. When asked by the court about the progress of her treatment, Shores offered his opinion that Margot still needed to work on her anger issues as well as couple's counseling with Ryan, and it could take six months of additional therapy before Margot would be prepared to parent successfully. Petersen, the couple's therapist, testified as an expert in clinical social work and echoed Shores's opinion that another six months of counseling could help them address domestic violence and Ryan's mental health, assuming that both parents received individual treatment in addition to couple's counseling.

In their closing arguments, Margot and Ryan asked the court to delay disposition of the case in light of testimony indicating that they could make significant progress in six months.[4] Noting that OCS had not yet identified a potentially permanent home for the children, the court observed that providing the parents with an additional six months might not affect the timeline for the children's placement. But the State and the guardian ad litem (GAL) argued for immediate termination to increase the children's chances for permanency.

A court must make five factual findings before terminating a parent's rights to an Indian child.[5] Here, the superior court found by clear and convincing evidence that (1) the children were in need of aid due to parental domestic violence, mental illness, and Ryan's substance abuse;[6] (2) Margot and Ryan had not remedied the conduct or

---

[4]     Margot's tribe moved to intervene on the second day of trial and also asked the court to postpone its decision.

[5]     *See, e.g.*, *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014); *see also*, CINA Rule 18(c); 25 U.S.C. § 1912.

[6]     *See* AS 47.10.011(8) (domestic violence), (10) (substance abuse), (continued...)

conditions placing the children at substantial risk of harm; and (3) OCS had made active efforts to prevent the breakup of the Indian family. Next, the superior court found beyond a reasonable doubt that (4) returning the children to Margot's and Ryan's custody would likely result in serious emotional or physical damage to the children. Finally, the court found by a preponderance of the evidence that (5) termination of parental rights was in the children's best interests. Accordingly, the court terminated both parents' rights.

This appeal followed, with Ryan challenging the court's failure to delay the proceedings, Margot challenging the active efforts finding, both Margot and Ryan challenging the serious harm finding, and Ryan challenging the best interests finding.[7]

## III. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Not Delaying The Termination Proceedings For Six Months.

"We review a denial of a motion to continue for abuse of discretion, determining whether a party has been deprived of a substantial right or seriously

---

[6]     (...continued)
(11) (mental illness).

[7]     We decline Margot's and Ryan's invitations to apply the recent ICWA final rule to this case. That rule, which requires expert testimony addressing the subject of likelihood of damage to the child, does not affect proceedings initiated prior to December 12, 2016. *See Ava T. v. State*, No. S-16144, 2016 WL 5335673, at *7 (Alaska Sept. 23, 2016); *Kent K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-15708, 2016 WL 483254, at *4-7 (Alaska Feb. 3, 2016); Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,876 (June 14, 2016) (to be codified at 25 C.F.R. § 23.143).

prejudiced by the lower court's ruling."[8] We conclude that the superior court did not abuse its discretion here.

In light of testimony that the parents could make progress given another six months of services, Ryan argues the court should have delayed the termination proceedings. But based on the ongoing mental health, substance abuse, and domestic violence issues, the superior court concluded that an additional six months was not "likely to lead to meaningful changes and a likelihood of reunification" in this case. We have previously held that the superior court did not abuse its discretion in denying a request for a continuance where the parent had failed to cooperate with his case plan for two years before the termination trial.[9] In that case we considered the time-sensitive nature of CINA cases and held that the superior court was justified in avoiding further delay in the proceedings.[10] Here Ryan showed "no real changes" in the nearly three years of the case — he continued to struggle with substance abuse despite treatment and multiple referrals, and he did not engage in mental health treatment despite Scoblic's efforts to help him identify affordable services and apply for Medicaid. Margot failed to demonstrate that she had internalized the harms of domestic violence to the children despite counseling. Ryan has not identified serious prejudice or the deprivation of a substantial right resulting from the court's refusal to delay proceedings. Therefore, the superior court did not abuse its discretion.

---

[8] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009). Although Ryan did not formally move to continue, we will review the superior court's decision under the same standard.

[9] *Id.* at 1019.

[10] *Id.*

**B.** **The Court Did Not Err In Finding That The State Made Active Efforts To Prevent The Breakup Of The Indian Family.**

Under ICWA OCS must demonstrate that active efforts have been made to prevent the breakup of the Indian family before a parent's rights may be terminated.[11] "Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[12] "We review de novo whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules,"[13] and we review the superior court's factual findings for clear error.[14] Active efforts are distinguished from passive efforts in that "[a]ctive efforts occur 'where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.' "[15] In determining whether OCS made active efforts, we look to OCS's involvement in its entirety over the course of the case.[16] A period of time without active efforts will not necessarily render

---

[11] *See* 25 U.S.C. § 1912(d).

[12] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011); (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[13] *Pravat P.*, 249 P.3d at 270; (quoting *Dale H.*, 235 P.3d at 210).

[14] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[15] *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[16] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763-64 (Alaska 2009); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008).

the efforts inadequate in their entirety.[17] We conclude that the superior court did not err in finding that OCS made active efforts in this case.

Margot argues that OCS failed to contact her after the August 2015 assault and that this amounted to a lack of active efforts to prevent the breakup of the Indian family. She does not dispute that OCS made active efforts prior to August 2015; rather, she argues that the approximately seven-month period between their last contact and the termination trial amounted to passive efforts and made the breakup of the family inevitable. Particularly in light of testimony that Margot "could have benefitted from another six months of services," Margot asserts that the seven-month gap could have been used to "direct Margot in her case plan and explain what was expected of her."

There is evidence that Scoblic's efforts did decline during this period. She apparently did not meet with Margot between Margot's graduation from Mental Health Court in July 2015 and the trial in April 2016, and she did not update Margot's case plan after Margot graduated from Mental Health Court. But there was also evidence that ongoing efforts continued and were unsuccessful. Scoblic testified that after each domestic violence incident, she would process the event with Margot and explain "what it meant to be case-plan compliant"; though she could not remember if they met in person, she spoke on the phone with Margot after the August 2015 incident. Scoblic continued to facilitate visitation with both parents even after they separated in October 2015, and she worked with Ryan on accessing mental health services.

The superior court acknowledged the apparent gap in contact but evaluated OCS's efforts over the entirety of the case.[18] The court observed that OCS had

---

[17]     *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1109 (Alaska 2011) (citing *Maisy W.*, 175 P.3d at 1268-69).

[18]     Even if OCS's efforts were passive during a seven-month period, this
(continued...)

developed case plans throughout the case and provided visitation, urine analysis tests, and numerous referrals to parenting classes, individual and couple's counseling, and substance abuse assessments. But despite years of services, Margot had failed to engage in regular treatment, acknowledge the ramifications of domestic violence, or make meaningful change. In evaluating the sufficiency of the State's efforts, courts may consider a parent's "demonstrated lack of willingness to participate in treatment."[19] Particularly with regard to the domestic violence, the court noted that Margot "when asked, was unable to articulate what's wrong with domestic violence in any meaningful way and . . . how it would affect the children." The court also observed that in the nearly three years since the OCS case began there had been little appreciable change in the parents' behavior. Based on these conclusions, the superior court did not err in finding that active efforts were met.

**C. The Superior Court Did Not Err In Finding That Returning Durham And Marley To Margot's and Ryan's Care Would Likely Result In Serious Emotional Or Physical Damage To The Children.**

We review for clear error a court's finding that continued parental custody is likely to result in serious emotional or physical damage to the child.[20] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm

---

[18]     (...continued)
would not undermine the active efforts that OCS made during the first two years of the case; considered in their entirety, the State's efforts were active. *See, e.g., Christina J.*, 254 P.3d at 1106, 1109-10 (holding that the State's efforts were active in their entirety despite three months of passive efforts out of thirteen total months of involvement).

[19]     *Maisy W.*, 175 P.3d at 1268.

[20]     *Christina J.*, 254 P.3d at 1103-04.

conviction that a mistake has been made.' "[21] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[22] The serious damage finding must be supported by expert testimony and evidence beyond a reasonable doubt,[23] although expert testimony need not independently meet the burden of proof and can be supplemented by lay testimony.[24] We conclude that the superior court's findings that the parents' conduct was likely to harm both children and that this conduct was unlikely to change were not clearly erroneous.[25]

The court's findings were supported by expert testimony and evidence. Dr. Collins testified that exposure to domestic violence affected children's brains and created a risk of physical and emotional harm to the children and that a pattern of past domestic violence is a likely predictor of future conduct. Shores testified that Margot demonstrated only a minimal understanding of how domestic violence affected children, did not attend therapy regularly, and still needed to work on couple's counseling and anger trigger issues. Petersen testified that he had recommended that Ryan obtain medication for anxiety and depression, but he understood that Ryan had "thought about

---

[21]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[22]     *Id*. at 428 (quoting *Maisy W.*, 175 P.3d at 1267).

[23]     *See* 25 U.S.C. § 1912(f).

[24]     *See Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015); *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011); *L.G. v. State, Dep't of Health and Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

[25]     *See Pravat P.*, 249 P.3d at 274.

it, but hasn't followed through." The expert testimony demonstrated that both parents engaged in conduct that was likely to harm the children and that this conduct was unlikely to change.

The court also looked to the parents' history of conduct, as it was entitled to do.[26] A parent's inability to address the underlying concerns in an OCS case, despite formally completing case plan requirements, may bear on the likelihood of harm to the children.[27] The court observed that the parents continued to engage in domestic violence despite individual and couple's counseling, and that Ryan's substance abuse continued despite substance abuse treatment. Margot's own testimony showed that she had not internalized the harmful effects of domestic violence on the children and she told the court that she "[didn't] see a problem because I've been doing everything on my case plan." Ryan's failure to attend the first day of trial was itself apparently a manifestation of the mental health issues that he did not treat despite OCS's requirement that he "demonstrate that he has his anxiety and depression under control so that he can meet his own needs and the needs of his children." His well-documented struggle with substance abuse and his failure to seek mental health treatment made it likely that the conduct placing the children at risk of harm would continue, as the substance abuse, mental health issues, and domestic violence all appeared to be related.

---

[26] "Although the court must focus on risk of future harm rather than past injury, past failures may predict future conduct." *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 767 (Alaska 2009) (first citing *J.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 38 P.3d 7, 11 (Alaska 2001); then citing *L.G.*, 14 P.3d at 950).

[27] *Cf. Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (considering a parent's failure to internalize what she had learned about domestic violence and parenting in affirming the superior court's finding that she had not remedied the conduct placing the child at risk).

Margot argues that the evidence presented at trial regarding her history of domestic violence and mental illness related to her past conduct, rather than the future likelihood of harm, and that Dr. Collins's testimony was "too outdated to predict future harm." She claims that she was "stabilized" at the time of trial. But the controlling consideration under ICWA is not the date of the expert's evaluation, but rather "whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it."[28] Although Dr. Collins had not seen Margot since the June 2014 assessment, he testified that her schizophrenia, which first manifested in adolescence, was "not going to go away," and he had reviewed her history and treatment plans up to the assessment. Margot's stabilization claim was predicated on medication compliance, and Dr. Collins explained how Margot would regress if she did not engage in individual therapy in addition to medication.[29] Both Shores and Petersen, who had worked with Margot more recently, also testified that she still needed to engage in services before Marley could be placed with her. The court's findings were supported by expert testimony.[30]

---

[28] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

[29] We have also previously permitted a court to rely on a dated expert opinion where it found that the concerns expressed in the original evaluation were still applicable, and the parent had not adequately followed the doctor's recommendations. *Barbara P.*, 234 P.3d at 1253-54. Dr. Collins recommended that Margot consistently engage in individual therapy, but she did so only when it was required by the Mental Health Court, which ended in July 2015 and was followed by a domestic violence incident the next month.

[30] Margot also argues that because the last domestic violence incident was in August 2015 and she no longer lived with Ryan, the likelihood of future domestic violence was low. But given the testimony from her therapists and her apparent inability

(continued...)

Ryan argues that the evidence was not sufficient to establish that the children would suffer harm and that the court's conclusion that his substance abuse created a risk of harm was not supported by expert testimony.[31] But the court's finding that the couple's tendency to engage in domestic violence was fueled by Ryan's substance abuse was supported by the evidence, including the couple's own descriptions[32] and Ryan's conviction in August 2015. Additionally, Dr. Collins provided expert testimony on the risk of harm to the children from exposure to domestic violence and Ryan's substance abuse. Based on this evidence, the superior court did not clearly err in finding that both parents' conduct placed the children at risk of harm and was likely to continue.

---

[30] (...continued)
to internalize the harms of domestic violence, as well as Scoblic's testimony that the couple had previously separated and reunited, Scoblic's surprise that they were still seeing each other after telling her they separated in October 2015, and the multiple domestic violence incidents suggesting a cycle, there was sufficient evidence to support the opposite conclusion.

[31] Ryan also argues that the risk of harm posed by returning the child to the parent's custody must be based on the same parental behavior that initially rendered the child in need of aid, i.e., mental injury under AS 47.10.011(8). But we regularly consider other factors when reviewing the risk of harm to the child. *See, e.g.*, *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014) (child's need for permanency); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1205-06 (Alaska 2002) (foster parents' ability to address the child's special needs).

[32] Margot told a social worker in July 2013 that "arguments usually started over 'stupid stuff' when [Ryan] was intoxicated . . . which leads to [Ryan] hitting her." This pattern apparently did not change; when Ryan described the August 2015 incident to Petersen, he said that he "thought he could have a few drinks and . . . became very intoxicated and then became angry."

**D.** **The Superior Court Did Not Err In Finding That Termination of Margot's And Ryan's Parental Rights Was In The Children's Best Interests.**

We "review for clear error the superior court's factual determination[] as to whether the State met its evidentiary burden in showing that . . . termination of parental rights is in the children's best interest."[33] Here we conclude that the best interests finding was not clearly erroneous.

Ryan argues that "courts should not assume that termination of parental rights leads to permanency" and that evidence that the parents consistently visited the children was enough to establish a parent-child bond that would harm the children if severed. He also argues that the court improperly relied on argument from the GAL and the State, rather than evidence, that "the children were more likely to find permanent homes if placed on the adoption exchange." But the court recognized that the GAL's argument was not testimony, and the court was entitled to weigh the evidence and conclude that it "really [didn't] have" testimony that the children were bonded to their parents and wanted to be with them.

Furthermore the court was entitled to consider the parents' lack of progress in their case plan and the children's need for permanency.[34] "We have repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their

---

[33] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[34] *See Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 967 (Alaska 2013) (upholding the superior court's best interests finding when a mother had not only "failed to remedy her substance abuse behavior but [also] had made no significant progress toward that end and had demonstrated that she was not inclined to change those behaviors").

children to be in need of aid"[35] and that the absence of a pre-adoptive placement does not preclude a finding that the child's best interests warrant termination.[36] By trial Marley was almost three years old and had spent her entire life in state custody; Durham was seven years old and had been in state custody for nearly half his life. Despite nearly three years of services, the court saw almost no behavioral change in the parents and did not think that delaying termination would be "likely to lead to meaningful changes and a likelihood of reunification." Therefore, the court did not err in finding that termination was in the children's best interests.

## V.    CONCLUSION

We AFFIRM the superior court's termination of Margot's and Ryan's parental rights.

---

[35]    *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010) (citing *J.H. v. State, Dep't. of Health & Social Servs.*, 30 P.3d 79, 87 (Alaska 2001)).

[36]    *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1024 (Alaska 2012).

CARNEY, Justice, with whom MAASSEN, Justice, joins, dissenting in part.

I believe that the superior court abused its discretion in denying Margot's request for a six-month continuance. I further believe that the Office of Children's Services (OCS) failed to make active efforts with respect to Margot to prevent the breakup of this Indian family. I therefore respectfully dissent from the portion of today's decision pertaining to Margot. I would reverse the superior court's order terminating her parental rights.

Margot, Ryan, and Margot's tribe all asked the court to postpone its decision regarding the termination of parental rights. Margot's tribe asked for additional time to prepare a position on the termination of Margot's parental rights and to explore the option of supplementing services for Margot. Margot and Ryan requested that the court postpone the proceedings by six months to allow them time to make further progress on the issues identified in their case plans.

Although Ryan's commitment to working on these issues was intermittent at best, Margot had shown greater commitment and promise — particularly during the time she participated in Mental Health Court. More importantly, despite the parents' varying levels of participation and their lack of complete rehabilitation by the time of trial, their therapists opined that additional counseling could have made an important difference for the parents. Margot's counselor, Bryan Shores, testified that another six months of therapy might be sufficient to prepare her to be a successful parent. The parents' relationship therapist, Corby Petersen, noted that Margot seemed committed to taking her medication, and he also estimated that another six months of therapy could help the parents address their domestic violence issues and Ryan's mental health concerns.

The superior court denied the continuance, noting that it believed this case differed from *Karrie B. ex rel. Reep v. Catherine J.*[1] In *Karrie B.*, this court affirmed the trial court's decision denying the State's petition to terminate parental rights but authorizing it to reapply in six months.[2] The superior court in the present case stated that, unlike the court in *Karrie B.*, it did not believe — despite the professionals' testimony — that an additional six months of services was likely to lead to meaningful changes by the parents that would make reunification possible. The court stated that this case presented "a close and difficult question" but nonetheless found that it was not in the children's best interests to delay its decision by six months. In reaching its conclusion, the court cited the guardian ad litem's (GAL) position that the children would be more likely to find a permanent home if their parents' rights were terminated.

But, as was also the case in *Karrie B.*, no permanent placement had yet been identified for the children. After spending more than a year and a half in their grandparents' care, the children were removed in 2015 after OCS learned that the grandparents had been drinking to excess. OCS moved the children to a non-Native, non-relative home, and by the time of trial, the foster parents were no longer willing to adopt them.

The court itself acknowledged that delaying its decision might not affect the children's chances for permanent placement. And the GAL's and OCS's plan to achieve permanency for the children was simply to add their names and photographs to the "adoption exchange"[3] and to list them with the PARKA program, "an adoption

---

[1]     181 P.3d 177 (Alaska 2008).

[2]     *Id.* at 183, 187.

[3]     Presumably, the GAL and OCS caseworker were referring to the Alaska
(continued...)

preparation, matching and support program" run by the Alaska Center for Resource Families.[4]

Given these facts, I believe this case more closely resembles *Karrie B.* than did the superior court — and therefore warrants more careful consideration of the appropriateness of a continuance — and I believe the court abused its discretion in denying the requests to continue this matter for six months. This court finds an abuse of discretion in the denial of a continuance when "a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling."[5] The superior court's denial of a continuance seriously prejudiced Margot by denying her the opportunity to demonstrate that she could maintain compliance with her case plan and sufficiently address OCS's concerns. My conclusion that this decision was an abuse of discretion finds further support in my belief that OCS did not make active efforts to prevent the breakup of this family.

While I recognize that OCS is entitled to rely upon its efforts over the entire course of its involvement with this family, the caseworker's failure to contact Margot in the seven months following the last domestic violence incident rendered its overall

---

[3]     (...continued)
and/or Northwest Adoption Exchanges. They are websites that display the photos of children whose parents' rights have been terminated, and who are therefore available to be adopted. OCS's website provides links to both of these exchanges. *Links*, ALASKA DEP'T OF HEALTH & SOC. SERVS., OFFICE OF CHILDREN'S SERVS., http://dhss.alaska.gov/ocs/Pages/links/default.aspx (last visited Mar. 5, 2017).

[4]     *PARKA (Preparation of Adoption Readiness for Kids in Alaska)*, ALASKA CENTER FOR RESOURCE FAMILIES, http://www.acrf.org/adoption-parka.php?tn=4 (last visited Mar. 5, 2017).

[5]     *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

efforts insufficient. OCS was aware of Margot's various mental health diagnoses, including possible fetal alcohol spectrum disorder, and took them into account in identifying services for her and assisting her in taking advantage of them prior to July 2015.[6] Margot's mental health needs were highlighted in each of the case plans the caseworker prepared. Given OCS's focus on Margot's mental health as integral to her ability to parent safely, her caseworker should have been taking steps to ensure Margot obtained appropriate treatment. But after Margot graduated from Mental Health Court, a lengthy program of intensive counseling strengthened by the additional incentive of avoiding incarceration for failure to participate, her caseworker had *no* in-person contact with her.

The caseworker's trial testimony reveals that she did not update Margot's case plan between December 2014 and March 2016; that she did not meet with Margot at any time after her graduation from Mental Health Court in July 2015; and that she never conveyed her expectation that Margot would continue to engage in the counseling that had been part of her treatment program in Mental Health Court. In a March 2016 counseling session with Petersen, and again in her testimony at the termination trial, Margot expressed confusion about what more OCS required in order to deem her compliant with her case plan.

Margot's completion of an intensive, long-term therapeutic program marked a significant improvement over her past performance. She and Ryan were no longer living together by that time; their decision to live apart likely placed them in a better position to address their history of domestic violence. Margot's recent progress

---

[6]     *N.A. v. State, DFYS*, 19 P.3d 597, 602-03 (Alaska 2001) ("Active efforts occur 'where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.' " (quoting *A.A. v State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999))).

may well have provided an opportunity for continued success in addressing her case plan, if OCS had not simply left her to her own devices.

Coupled with the trial court's refusal to allow her (and Ryan) an additional six months to continue their recommended therapy and medication, OCS's failure to make active efforts to assist Margot diminished her ability to demonstrate that she had remedied the conduct that placed her child at risk, and to prevent the breakup of her family.

I therefore respectfully dissent from the court's decision affirming the termination of Margot's parental rights.